**500**

Leslie SMITH, et al., Plaintiffs, Claimants, Appellees, Cross-Appellants,

v.

UNITED STATES of America, Defendant, Claimant, Third-Party Plaintiff, Appellant, Cross-Appellee,

v.

RONLEE, INC., Defendant, Claimant, Third-Party Defendant, Fourth-Party Plaintiff, Appellant, Appellee, Cross-Appellee,

v.

E. & I., INC., Defendant, Claimant, Fourth-Party Defendant, Appellant, Cross-Appellee,

v.

CROSS CONTRACTING CO., INC., Petitioner for Limitation of Liability, etc., Defendant, Plaintiff, Appellant, Cross-Appellee.

No. 72-3736.

United States Court of Appeals, Fifth Circuit.

July 19, 1974.

Rehearing Denied Aug. 27, 1974.

Robert W. Rust, U. S. Atty., Clemens Hagglund, Asst. U. S. Atty., Miami, Fla., for U. S. A.

Richard F. Ralph, Miami, Fla., for E. & I., Inc.

Edward L. Magill, Miami, Fla., for Ronlee.

William R. Eckhardt, Houston, Tex., Harry Zuckerman, Miami, Fla., for Cross Contracting Co.

Laurence F. Ledebur, Thomas L. Jones, Walter H. Fleischer, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for appellants.

Donald Feldman, Miami, Fla., for W. Mann & J. Law.

Arthur Roth, Miami, Fla., for L. Smith, M. Smith & J. Gray.

Wicker, Smith, Pyszka, Blomqvist & Davant, Miami, Fla., for Highlands.

Before BELL, SIMPSON and IN-GRAHAM, Circuit Judges.

SIMPSON, Circuit Judge:

This is an interlocutory appeal on the issue of liability by the defendants, all of whom were found negligent in a bench trial by the lower court. The trial was bifurcated as to liability and damages. Additionally, two of the five personal injury plaintiffs, Joseph Law and Leslie Smith, cross-appeal from the district court's findings of contributory negligence on their part.

The original actions alleged admiralty jurisdiction in the lower court for personal injuries to the plaintiffs occurring on navigable waters. Title 28, U.S.C., Sec. 1333(1). Jurisdiction over the United States (United States or occasionally, the government) was based upon The Suits in Admiralty Act, Title 46, U.S.C., Secs. 741–752 (waiver of sovereign immunity).[1] The lower court found that the United States had been negligent, its contractor Ronlee, Inc. (Ronlee), a Florida corporation, had been negligent, Ronlee's subcontractor E. & I., Inc., (E. & I.), a Florida corporation, had been negligent, and E. & I.'s subcontractor Cross Contracting Company, Inc. (Cross), a Louisiana Corporation had been negligent, and was also liable to the plaintiffs, its own employees, for furnishing unseaworthy barges. The court further found that the United States was entitled to indemnity from Ronlee, that Ronlee was enti-

---

[1] In addition to Cross Contracting Co., Inc.'s Petition for Exoneration From or Limitation of Liability as owner of Drill Barge No. 2 (filed March 7, 1968, following filing of the original complaints in early November, 1967, and denied, with no ensuing appeal, by the Judgment as to Liability entered below October 23, 1972) eight separate original actions were brought by the five injured plaintiffs.

Numerous theories of recovery were asserted in the various plaintiff's actions, including: Jones Act negligence against Cross; maintenance and cure against Cross; maritime claims for unseaworthiness and negligence against Cross; breach of warranty against Cross; absolute liability against Cross for lack of exercise of due care in extra-hazardous activity, blasting; against the United States for negligence and for breach of contract; against the United States in strict liability; and also against duPont and Ensign-Bickford for breach of warranty, products liability, and negligence (see below).

Named as defendants in the plaintiff's actions were Ensign-Bickford Co., Inc. a Connecticut corporation, manufacturer of the primacord used in blasting, and E. I. duPont de Nemours & Co., Inc., a Delaware corporation, the supplier of the dynamite, primacord, blasting caps, delay devices and other explosive materials and the manufacturer of most of those materials.

Ensign-Bickford Co. was dismissed as a defendant March 12, 1969 for lack of jurisdiction over the person. No appeal was taken from this dismissal.

Recovery against duPont de Nemours & Co., Inc., as to all claims was denied by the Judgment entered October 23, 1972. duPont's cross-claim against Cross Contracting Co., was therefore held moot. The judgments in duPont's favor are not appealed. The United States filed third party complaints against Ronlee, Inc. Ronlee cross-claimed against E. & I., Inc. and against Cross Contracting Co., Inc. and E. & I. cross-claimed against Cross Contracting Co., Inc.

The various original suits, counter-claims, and cross-claims were tried as to liability only in a consolidated trial. The results of the trial, insofar as they affect these consolidated appeals, are set forth in the text.

tled to indemnity from E. & I., and that E. & I. was entitled to indemnity from Cross, based on similar "hold harmless" clauses in the original contract and in each of the subcontracts. Finally, as noted above, two of the plaintiffs were found to have been contributorily negligent. We remand for further findings in connection with the negligence issues, affirm as to the indemnity claims, and reverse the finding of contributory negligence as to Joseph Law and Leslie Smith.

## I FACTS

Though tried only as to liability, this case required many days in actual trial, and many many more in pre-trial hearings, conferences, motion hearings and the like. The facts are involved, technical, complex and sometimes confusing. We relate only such facts as are pertinent to our disposition of the instant appeal. The starting point was the decision by the government, through the U. S. Army Corps of Engineers, to construct a levee project known as Levee 47 on the east side of Lake Okeechobee, in Florida. The entire project was originally contracted to Ronlee. Ronlee, in turn, subcontracted about half of it to E. & I., involving the southern portion of the project.[2] E. & I., then subcontracted its entire share to Cross. The actual work was done exclusively by Cross employees using equipment owned or supplied by Cross, including the two barges involved here.

The underlying events giving rise to these proceedings involved dynamite blasting done in a borrow pit near the construction area. Underwater blasting was necessary in order to break up rock that was being used for the construction of the levee. The basic procedure included the use of two drill barges outfitted with power drilling equipment for drilling holes in the lake bottom into which dynamite charges could be dropped underwater. A licensed blaster was in charge of each barge and assisted by three helpers.

On November 11, 1966, a day of fair weather, the two drilling-blasting barges were facing each other in the borrow pit and Cross employees were engaged in blasting operations. Under normal circumstances, the actual detonation of dynamite was to be preceded by observation of several safety measures. When both barges had completed drilling and loading the allotted number of holes, they were to move back from the line of charges, and from each other, to a distance of not less than 250 feet. The two barges were generally worked as a unit and the charges associated with one barge would not be set off until the other barge was in position and ready to detonate. The Corps of Engineers safety manual prescribed that, at blasting time, air horn signals were to be given so that all workers on either barge could take cover.

Each barge had a blasting machine, which is the plunger apparatus commonly associated with dynamite blasting. Each also had a lead line and a skiff with an outboard motor. Just prior to the accident, the workers at barge No. 1 had completed drilling and loading six holes on 8-foot spacings to an overall depth of 33 feet. Barge No. 1 had been moved back to safe distance. Joseph Law was the licensed blaster in charge of that barge, and his brother, Herbert Law, was one of the three helpers assigned to it. The other personnel on barge No. 1 consisted of helpers Stephen Jones and James Jackson. The work of drilling and loading at barge No. 2 had not been completed. Leslie Smith was in charge of that barge, assisted by helpers Melbourne Smith, Joseph Gray, and Willie Mann, Jr.

At this time the two barges were about 346 feet apart, barge No. 1 being at Station 15 plus 00 south of No. 2, which was at Station 18 + 46. It was brought to the attention of Leslie Smith

---

**2.** The northerly portion of the project was subbed to another contractor by Ronlee and is not involved in these proceedings.

that some special assistance was needed in breaking up a large rock north of barge No. 2. It sometimes occurred that a particular rock was too large for use in construction, even after having already been once blasted. It was customary in such a situation to employ a "dobie shot". This procedure involved a blaster using his skiff to go to the location of the rock from his barge, dropping dynamite bundled together into the water next to the rock, then retreating to a safe distance to detonate. Leslie Smith ordered his helper Willie Mann to take the skiff from their barge, No. 2, pick up Joseph Law at barge No. 1, then circle back to the location north of barge No. 2 where special blasting was needed. Mann did as instructed, and Joesph Law joined him in the skiff from barge No. 2, taking the blasting machine from his barge No. 1. They dropped the dynamite bundle and stopped momentarily at barge No. 2 to converse with Leslie Smith.

Joseph Law had left his brother Herbert, who was not a licensed blaster, in charge of barge No. 1. As noted the holes drilled by the barge No. 1 crew were loaded and ready for detonation. Herbert Law decided to detonate the charge. The workers at barge No. 2 were in the process of drilling and loading the last hole of that series. Herbert Law attempted to sound the air horn as a signal that he was going to blast, but the horn malfunctioned, as the evidence shows it had on prior occasions. He then waved his arms at the people he could see at barge No. 2, which was a procedure sanctioned by both his supervisor and the government inspector, Kenneth Spalding. At that moment Joseph Law waved good-bye from the skiff to Leslie Smith aboard barge No. 2. Herbert testified that he interpreted that wave to be a response to his arm waving. Since barge No. 1's blasting machine was in the skiff with Joseph Law, Herbert detonated by use of an electric battery located on barge No. 1. Simultaneously with the explosion of the charges from barge No. 1, the charges

set at barge No. 2 exploded, injuring Leslie Smith, his three helpers, and Joseph Law, who was in the skiff. These men are the five plaintiffs in the personal injury actions below.

The government inspector, Spalding, was not on the scene at the time of the accident, his visits to the work site being generally of short duration. Neither Ronlee nor E. & I. had any personnel or equipment at the site at any time. The government worked directly with Cross, although Ronlee received four percent and E. & I. six percent of the total contract funds. The evidence indicated and the trial court found that the explosion at barge No. 2 was not a result of faulty dynamite such that the blast at No. 1 would have caused the second explosion by virtue of propagation. There was testimony to the effect that no physical connection between the charges at No. 1 and No. 2 had been made, negating an inference that the detonation of one would have automatically detonated the other. The trial judge observed that the precise cause of the explosion at barge No. 2 could not be conclusively determined. It was undisputed that the signalling provisions of the safety manual were violated, and it appeared that such violations had not been uncommon or infrequent in the past.

## II  APPEAL BY THE UNITED STATES

The United States attacks the district court's imposition of liability upon it based on the negligence of Kenneth Spalding, the government inspector on the job, and argues alternatively that the finding of a right of indemnity from Ronlee should be affirmed. Error is also asserted with respect to the lower court's failure to assign a percentage to the contributory negligence of Law and Smith for purposes of comparative damages and a proportional reduction of the final judgment. That point is mooted by our reversal on the contributory negligence issue, infra, Part V.

The district court's pivotal finding as to the government's negligence is Finding of Fact number 14, which we quote in full:

"14. The contractor was required to conduct weekly safety meetings with all employees in order to indoctrinate the employees to the application of and compliance with the safety program. The safety meetings were conducted weekly by Kenneth Spalding, the United States inspector on the job. The meetings were attended weekly by some of the employees, but not by all of them. Ed Woolridge, Cross' superintendent on the job, called the meetings and attended them. The meetings were not held in a manner which would reasonably indoctrinate the employees in the application of and compliance with the safety program.

Barge No. 1 was equipped with an air horn for signalling, while barge No. 2 had no signalling device. The air horn of barge No. 1 would stick and not work from time to time. The men complained to Woodridge (sic) and Spalding about the malfunction of barge No. 1's horn. Spalding told them that, as the situation required, they could wave their hands back and forth as a substitute for a horn signalling system. Spalding further instructed the men to signal just before they were ready to detonate.

These instructions from Spalding constituted a departure from the requirements of the manual. The signalling procedure adopted by Spalding and given to the mean (sic) was not a consistent one. It depended in a large measure on distances between the barges. When it was considered that the barges were a "safe distance" apart, no signals were to be given. In addition, Spalding directed the use of hand signals between the barges. . . .

The signalling procedure was negligently devised by the United States inspector in the scope and course of his employment.

In addition, the United States inspector had knowledge of the method of signalling actually used and the dangers incident thereto. He had the power to rectify same, but did not so do.

The failure to have an audible signalling device on barge No. 2, the failure to have one which consistently worked on barge No. 1, and the failure to have a comprehensive and uniform signalling procedure constituted negligence on the part of Cross. This negligence existed not only on November 11, 1966, but for a significant number of months prior thereto."

These findings were applied by the district court to impose liability on the United States in Conclusion of Law No. 7:

"7. The giving of instructions regarding blasting procedure was not a discretionary function, but was one on the operational level. The United States is not liable for inspecting the work, but it is liable for negligent direction thereof. When the United States merely observes and is guilty of omission or inaction, it cannot be liable. When it affirmatively acts and instructs negligently, as it did herein, it is liable."

■ The government initially argues that there is not evidence in the record to support the finding that Spalding did, in fact, devise and instruct with respect to the hand signalling system. We review the finding by the district court under F.R.Civ.P. 52(a), and reverse only if it is clearly erroneous. McAllister v. United States, 1954, 348 U.S. 19, 75 S. Ct. 6, 99 L.Ed. 20. That standard has consistently been interpreted by this court to mean that to warrant reversal the finding of fact must be without the support of substantial evidence. See, for example, Lentz v. Metropolitan Life Ins. Co., 5 Cir. 1970, 428 F.2d 36, 39. We discern substantial evidence in this record to support the district court's finding of negligence by the United States.

The government correctly states that it cannot be found liable simply because it had knowledge of a dangerous procedure yet failed to rectify it, and the district court said as much in its Conclusion of Law No. 7. But it is equally true that if Spalding did devise and instruct with respect to the concededly dangerous procedure, the government is responsible for such an affirmative act of negligence. Spalding himself said, in a deposition admitted into evidence, that he did not recall who devised the system. App. at 632. Woolridge, the Cross supervisor directly in charge of the work at the borrow pit, testified that Spalding conducted the safety meetings at which the system was discussed and adopted. App. at 301. Leslie Smith testified that the arm waiving procedure was for use both in signalling the fact of an impending detonation by the blasting barge, and in acknowledging recognition of that signal by the other barge. App. at 670. Smith also substantiated Woolridge's testimony that Spalding led the safety meetings, and went on to state expressly that it was Spalding who devised the arm waiving procedure. App. at 681–82. In light of the foregoing we cannot say that the district court was clearly erroneous in finding that Spalding devised the system.

■ The United States raises a further point in connection with its negligence liability. The relevant finding of the lower court is Finding of Fact 18, which stated:

"Had the signalling system set forth in the manual been followed, or had a reasonably prudent and safe signalling procedure been devised and required to be followed, the injuries to the personnel of the drill barges would not have ensued. The plaintiffs would have been out of the risk of harm from the explosive materials on the rear of drill barge No. 2, which explo-

sives caused the injuries to the plaintiffs. (Damage to drill barge No. 2 was in the immediate area of the explosive materials at the stern of said barge.) The improper method of using hand signals was a proximate cause of the injuries.

The risk and harm to be anticipated by an improper signalling system unfortunately came to be realized."

The government's argument turns on the simplistic postulate that there can be no proximate cause without cause in fact. Since the district court declined to speculate as to the exact cause of the explosion at barge No. 2, it is urged that the finding of proximate cause is without a factual basis as required by F.R.Civ.P. 52.

Technically, we agree with the government on this point. The district court erred in its failure to delineate properly the elements of causation as they apply to this case.[3] There are two major aspects to the principle, both requisite to a finding of tort liability. First there must be cause in fact, which means that a cause and effect relationship must exist between the alleged tortious conduct and the injury. Second, the cause must be proximate, which is most often translated into whether or not the injury was a foreseeable result of the conduct in question. See generally Prosser on Torts, Sec. 41 Causation (3d ed. 1964).

The district court failed to make the requisite finding as to cause in fact. The court's thoughts on the subject appear outside its Findings of Fact and Conclusions of Law:

"It is not a question of two reasonable inferences. There is no testimony from which one could reasonably infer, in my judgment, the cause.

One could engage in conjecture and say the cause was one of two things —one of three things: Defect: some-

---

3. We note, in defense of the lower court's oversight, Professor Prosser's observation that, with respect to causation, "[t]here is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser on Torts, Sec. 41, Causation, at 240 (3d ed. 1964).

body connected the barges, or propagation: some unknown phenomena." App. at 1034. The above evidences, together with the absence of reference to cause in fact in the court's formal findings, that the question of whether the explosion at barge No. 1 caused the one at barge No. 2 was simply never resolved by the trial judge. It follows therefrom that liability could not have properly been imposed, because it is not established that anything Herbert Law did at barge No. 1 bore a cause and effect relationship to the explosion at barge No. 2.

The government next goes on to say that a remand on this issue is not necessary, because the district court already indicated that the cause could not be discerned. With this we disagree. It is true that the above quoted passage indicates that the court felt that the "cause" could not be determined. But "cause" is subject to interpretation. If the court meant that one could not reasonably infer that the explosion at barge No. 1 "caused" the explosion at No. 2, then there would be no "cause in fact". However, if the court meant only that the *precise* cause could not be determined or selected from several possibilities, then it would still be free, on remand, to find that the blast at No. 1, for whatever exact reason, caused the explosion at No. 2. A finding that it is more likely than not that one blast caused the other would satisfy this aspect of the causation principle. Accordingly, we remand for a further factual determination by the district court in this respect.

### III THE INDEMNITY CLAUSE

Another issue affecting all the defendants centers upon the indemnity clause in the contract between the United States and Ronlee, and incorporated by reference to the prime contract in each of the successive subcontracts. The relevant provision reads as follows:

The Contractor shall assume all liability and hold and save the Government, its officers, agents and employees harmless for any and all claims for personal injuries, property damages or other claims arising out of or in connection with the transportation, storage and use of explosives under the contract.

Since this issue touches all the parties, this discussion will deal with each defendant's contentions in this regard.

The district court held that the government was entitled to indemnity from Ronlee under the foregoing provision, notwithstanding its own negligence in the matter, and the government understandably argues that we should affirm that holding. Ronlee, E. & I., and Cross all urge that we reverse, based upon the fact that each indemnitee was itself negligent.

■ We begin our analysis with the Supreme Court's treatment of a similar, though not identical, contractual situation in United States v. Seckinger, 1970, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224. We observe initially that here, as there, the interpretation of the contract is controlled by federal law, which was entered into "pursuant to authority conferred by federal statute and, ultimately, by the Constitution." United States v. Seckinger, supra, 397 U.S. at 209–210, 90 S.Ct. at 884, 25 L.Ed.2d at 232.

■ In *Seckinger* the wording of the indemnity clause differed slightly from the clause of the prime contract with Ronlee here and hence that case is not directly applicable to this case. The contract in *Seckinger* provided, in pertinent part, that:

He [the contractor] shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work.

The United States had been negligent with respect to the plaintiff in that case, and the Supreme Court held that the indemnity clause entitled the government to recover back from the contractor that portion of the judgment awarded to the plaintiff as against the government alone which corresponded with the contractor's percentage of negligence con-

tributing to the plaintiff's injuries. In essence, it was an application of the comparative negligence principle usually associated with maritime law. The most significant distinction from our case is that the clause here under consideration does not say "as a result of his fault or negligence," but provides rather for indemnity "for any and all claims." We must decide then whether that distinction removes the contractual stipulation of this indemnity clause from the comparative negligence analysis of *Seckinger* and allows the government full indemnity despite its own negligence.

The basic issue in *Seckinger* was whether "all damages" meant "by whomever caused" or, as the Court ultimately decided, "all damages attributable to the contractor individually." In discussing these optional interpretations, some attention was given to what would suffice as evidence of a contractual agreement granting indemnity despite negligence by the indemnitee. We feel that portion of *Seckinger* most nearly answers the question raised by this case. Set forth at Note 17, 397 U.S. at p. 212, 90 S.Ct. at p. 886, 25 L.Ed.2d 234, is a sample contract provision, recommended by the American Institute of Architects, drafted to immunize the indemnitee from his own negligence (assuming the contractor is himself negligent). The language of that sample stipulation tracks closely that of the contract provision in this case. Especially similar is the use of phrases such as "hold harmless," "for any and all claims" and "assume all liability."

The only significant distinction between the two is that the model provision concludes with specific reference to the fact that indemnification shall obtain regardless of the indemnitee's negligence. The Court commented on this, saying that:

> We specifically decline to hold that a clause that is intended to encompass indemnification for the indemnitee's negligence must include an 'indemnify and hold harmless' clause *or* that it must explicitly state that indemnification extends to injuries occasioned by the indemnitee's negligence. (emphasis supplied) *Seckinger*, supra, Note 17.

The use of the disjunctive in this quotation raises a clear inference that a clause which does in fact utilize "hold harmless" language indicates the intent of the parties for the indemnity to operate despite negligence by the indemnitee. This is to say, if neither "hold harmless" language *or* an express disclaimer is required, the negative inference arises that the presence of either is a strong indication that indemnity is intended in spite of or regardless of negligence on the part of the indemnitee.

The Supreme Court, in reaching its decision in *Seckinger*, noted expressly that it was guided in part by synthesizing numerous applicable maxims of contract interpretation. Ibid, 397 U.S. at p. 215, 90 S.Ct. at p. 887, 25 L.Ed.2d at p. 235. Defendants Ronlee, E. & I., and Cross urge reversal of the district court based in large part upon the language of the maxims. Among those noted are: (1) a contract should be construed most strongly against its drafter; (2) an indemnitee should not be allowed recovery despite his own negligence unless the parties clearly demonstrated an intent to that effect; and (3) the disparity in the bargaining positions of the parties should be taken into consideration. We acknowledge the prima facie application and relevancy of these canons, but, nevertheless, on balance, conclude that they do not overshadow the unmistakable nature of the language used in this contract and the illuminating comments of the Supreme Court in *Seckinger*, particularly as to Note 17, supra.

Further, the indemnitor-defendants all cite us to state cases requiring a higher degree of precision in establishing indemnity despite mutual negligence. In Florida, an express statement to the effect that the indemnitee may so recover is required. Florida Power and Light Co. v. Price, Fla.1964, 170 So.2d 293. But as already noted our decision must be based upon federal contract interpre-

tation by federal courts and as authoritatively articulated by the Supreme Court. State decisions are often helpful in deciding federal questions, but not when the Supreme Court has indicated a contrary view.

We observe lastly that federal courts have reached the same conclusion in consideration of contract provisions substantially similar to the one at issue in this case. In Mississippi Power Co. v. Roubicek, 5 Cir. 1972, 462 F.2d 412, this court had occasion to consider an almost identical "hold harmless" indemnity clause, and to hold that it provided indemnity despite the indemnitee's own negligence. Though *Mississippi Power* was decided by an *Erie* application of state law, our opinion observed that Mississippi law, as to the particular point in question, is strikingly similar to federal law as declared in *Seckinger,* supra. Ibid, 462 F.2d at p. 415. The Second Circuit reached a similar conclusion in considering a virtually identical indemnity clause in the context of federal maritime law. Capozziello v. Brasileiro, 2d Cir. 1971, 443 F.2d 1155. We are convinced that in this case in light of the foregoing principles and decisions, the United States notwithstanding its own negligence, is entitled under the contract provisions to be indemnified by Ronlee.

This is not quite the end of the matter. The indemnity clause in the contract between the government and Ronlee was successively applicable as between Ronlee and E. & I., then between E. & I. and Cross, because the prime contract was incorporated *in toto* by reference into the subcontracts. Cross strenuously urges two additional grounds for not extending indemnification into the subcontracts, aside from whatever construction might be placed on the relevant clause in the prime contract.

Section 5 of each of the subcontracts provided, in part, that:

The Subcontractor agrees:

(a) To be bound to the Contractor by the terms of the Principal Contract, drawings, specifications, and other pertinent documents insofar as they are applicable to this subcontract and to assume toward the Contractor all the obligations and responsibilities that the Contractor, by those documents, assumes toward the Owner.

Logically, then, the district court determined by its Conclusion of Law 9, that this incorporation of the prime contract into the subcontracts included the indemnity clause, and that thus each respective contractor was thus entitled to indemnity—until, of course, the buck stopped with Cross.

■ Cross objects to the foregoing analysis on the ground that "the subcontract does not even intimate, much less spell out in unmistakable terms, that Cross is to indemnify E. & I., Inc. for damage approximately caused by negligence of E. & I., Inc." Brief for Appellant/Cross-appellee at 9. We find this position illogical and evidence of a true confusion in terms. Spelling out indemnity despite negligence in unmistakable terms refers to the language of the clause itself, not to an interpretation of a clause which undertakes to *incorporate* an already interpreted clause. Moreover, the incorporation clause does spell out exactly what it was intended to do, to require the subcontractor: "to assume toward the Contractor all the obligations and responsibilities that the Contractor, by those documents assumes toward the Owner." The district court properly construed this language as extending the indemnity protection successively to each contractor-indemnitee.

■ Finally, Cross asserts that the liability for which the government seeks indemnification is outside the terms of the clause and thus not indemnifiable, arguing that the government's negligence was for improper instruction in connection with hand signals, and thus liability was not based on the "transportation, storage, and use of explosives under the contract", as required by the indemnity clause. This argument fails by reason of its own semantical deficiency. While the *Negligence* of the government

was indeed based on the hand signal system, its *liability* arose "out of or in connection with the . . . use of explosives under the contract".

## IV  RONLEE'S APPEAL

Only one issue raised by Ronlee requires discussion here, as the others have either been resolved supra or will be resolved in connection with our handling of the cross-appeal. As to this issue we are, to a limited extent, breaking new ground, inasmuch as we have found no decided cases on point. However, we are guided by established general principles which we think point our way to a sound result.

This remaining issue is the finding of negligence as to Ronlee based upon the contractual arrangement it had with the government for superintendence of safety at the job site.

The district court's holding was based upon an analysis of the relevant contractual provisions viewed in light of the law applicable to independent contractors. We quote the pertinent contract provisions in part:

"11. SUPERINTENDENCE    BY
    CONTRACTOR

The Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during progress, with authority to act for him."

"40. ACCIDENT    PREVENTION
    (Jan.1965)

(a) In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract, the Contractor shall comply with all pertinent provisions of Corps of Engineers Manual, EM 385–1–1, dated 13 March 1958, entitled 'General Safety Requirements',

as amended, and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose.

(d) Compliance with the provisions of this article by subcontractors will be the responsibility of the Contractor.

(e) Prior to commencement of the work the Contractor will:

(1) Submit in writing his proposals for effectuating this provision for accident prevention:

(2) Meet in conference with representatives of the Contracting Officer to discuss and develop mutual understandings relative to administration of the overall safety program."

"41. GOVERNMENT INSPECTORS
    (Jan.1965)

The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the contracting officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the Contract."

In Finding of Fact 9 the district court found that Ronlee did not comply with any of the affirmative steps regarding safety it was obligated by the contract to take, except for submitting an accident prevention plan to the government (though not to the subcontractors). That plan provided, in pertinent part:

*"Accident Prevention Responsibilities*

The Project Manager will be responsible for the enforcement of Accident Prevention Plan and applicable portion of Corps of Engineers Safety Requirements and pertinent provisions of the Manual Corps of Engineers, U. S. Army, General Safety Require-

ments, EM 385–1–1, dated March 13, 1958, and Applicable Special Conditions to Contract Documents."

*"Subcontractors' Responsibility*

The subcontractors and subcontractors' supervisory personnel will be furnished a copy of the Accident Prevention Plan and be appraised of their accident prevention responsibility prior to the commencement of work. All subcontractors will be instructed in writing (copy of the letter to be sent to the Resident Engineer), concerning the requirements and their responsibility under this plan. Subcontractors will be subject to, and required to abide by, the Accident Prevention Plan and the Corps of Engineers Safety Requirements. The rules will be enforced by the Superintendent. All provisions of this plan apply equally to general contractor and subcontractors."

The specific applicable portions of the Corps of Engineers safety manual mentioned in the contract are set out in Finding of Fact 13:

"22–79. Prior to the firing of a shot, all persons in the danger area shall be warned of the blast and ordered to a safe distance from the area. Blast shall not be fired until it is absolutely certain that every person has retreated to a safe distance and that no one remains in a dangerous location.

"22–80. All blasting operations shall use the following signals. Warning Signal–A one minute series of long blasts five minutes prior to blast signal. Blast Signal–A series of short blasts one minute prior to the shot.

"22–81 a. Prior to, and while the drill boat or vessel is being moved from the blasting area, a series of short signals by horn or whistle, similar to the usual navigation warning signals shall be given.

"22–81 c. No blast shall be fired closer than 250 feet to a boat or vessel containing an explosive magazine. Men engaged in drilling operations on another drill boat within 500 feet

shall leave the drill frames for cover in the event that any complete holes have been loaded."

Reasoning from the foregoing, the district court concluded that Ronlee had control over job safety at all material times, that the provisions of the safety manual were violated, and therefore Ronlee was liable to the plaintiffs for negligence. Ronlee does not question the safety violations or the applicable law, but argues that it did not have "control" sufficient to obligate it to exercise reasonable care with respect to the safety of Cross' employees.

■ It is black-letter law that a general contractor is in general not liable for damages sustained by employees of his subcontractor. The well recognized exceptions to this rule occur either when the contractor has control over that part of the subcontractor's work which was involved in the accident, or when he has actual knowledge that work is being performed in a dangerous manner. Ronlee did not have actual knowledge of the signalling system, but it did have control over safety at the work site. That conclusion is the only permissible inference from the contract between Ronlee and the government. The common law exception to a general contractor's immunity appears in numerous textbooks and treatises, and we quote an acceptable version found in the Restatement of Torts 2d:

"414 Negligence in Exercising Control Retained by Employer

One who entrusts work to an independent contractor, but who retains the control of any part of the work is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement of Torts 2d, Sec. 414.

■ The initial difficulty in this particular situation is in assessing the effect of the subcontracts upon the prime

contract between Ronlee and the government. It is clear from the quoted portions of that prime contract that Ronlee was the independent contractor at the outset, and the government did not retain control over how Ronlee would insure compliance with the relevant safety requirements. Under the subcontract between Ronlee and E. & I., in section 5, each party agreed to assume the obligations and responsibilities toward each other that Ronlee and the government assumed under the prime contract. Thus one might plausibly think that Ronlee took the government's position with respect to controlling safety on the job site, and should therefore be without liability. The error in such reasoning is that Ronlee assumed some affirmative duties in the prime contract and, inferentially, authority to fulfill them, which could not be dispensed with simply by entering into a subcontract.

Several aspects of the prime contract lead us to the foregoing conclusion. In section 11, quoted supra, Ronlee agreed to personally superintend the work in highly unequivocal language. In section 40(d), quoted supra, Ronlee specifically agreed to guarantee that subcontractors would comply with the safety requirements, which is consistent with its promise to superintend. Clearly, Ronlee could not delegate to a subcontractor its contractual obligation to superintend subcontractors. Further, the accident prevention plan submitted by Ronlee to the government provided that the plan itself, including responsibility for compliance, would apply equally to Ronlee and its subcontractors. This reflects the very intent Ronlee would now disclaim, that it intended to assume responsibility for safety notwithstanding the letting of subcontracts. This reading is in turn supported by the fact that Ronlee continued to receive four percent of the contract funds paid by the government after having completely subcontracted the work covered by its contract with the government. We are entitled to assume that this payment was for an affirmative, continuing obligation which

Ronlee was not free to delegate to a subcontractor by virtue of a subcontract under which the parties agreed to assume the respective positions of the original contracting parties.

The official comments to the Restatement furnish additional and quite persuasive support for the foregoing. First, the degree of control necessary for liability under this theory is somewhat less than that necessary for finding parties to be in a master and servant relationship: "He [the employer] may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others." Restatement of Torts 2d, Sec. 414, comment a. Given the obligations of Ronlee under the prime contract, it is clearly reasonable to infer a corresponding degree of control over safety sufficient to satisfy the accompanying obligations, and therefore sufficient to come within the description in comment a supra.

The next comment to Sec. 414 is also in point, aptly describing the intended situation under the facts of this case.

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself."

Restatement of Torts 2d, Sec. 414, comment b.

Had Ronlee performed under the prime contract as contemplated by the parties to that contract, knowledge of the dan-

gerous manner in which blasting was being done would have been inescapable.

Ronlee attempts to overturn this finding as to its liability by reference to several additional facts of the case, none sufficient in our judgment to bring about the desired result. First, Ronlee did not have any personnel or equipment on the job, and never exercised the slightest control as to any aspect of the methods employed by Cross employees. This, of course, confuses the fact of control, that is to say authority, with the exercise of control. Just as only the former is relevant to the existence of a master-servant relationship, it is likewise the sole criterion for liability under the Restatement and its common law origin. See generally 41 Am.Jr.2d Independent Contractors, Sec. 29. Similarly, the fact that the government did exert some supervision through its inspector, Spalding, and did not notify Ronlee of any safety violations, is irrelevant. The control retained is the determinative factor. Furthermore, Ronlee agreed in Section 41 of the contract that the presence or absence of a government inspector would not work to relieve it of any contractual duties.

While there are a large number of reported cases dealing with this particular theory of negligence, few approach the peculiar factual situation presented by this case. Additionally, we have not found any cases which deal with contract provisions obligating the contractor to more than the standard boilerplate "power of inspection" with respect to safety. As we have noted, this contract went beyond that and provided for affirmative duties in connection with safety.

Most nearly in point and most persuasive are the few cases dealing with whether a contract, in and of itself, creates a right of control that, though unexercised, leads to liability because the failure to exercise it amounts to negligence of the owner-contractor. See, particularly, Trent v. Atlantic City Electric Co., 3 Cir. 1964, 334 F.2d 847; Jamison v. A. M. Byers Co., 3 Cir. 1964, 330 F.2d 657.

We find the cases cited in rebuttal by Ronlee of no help. They are uniformly inapposite. Many deal with the hazardous activity doctrine, Restatement of Torts 2d, Sec. 427, and are thus irrelevant to this discussion. Those dealing with the issue of control describe a significantly different level of control from that reflected in the contract between Ronlee and the government. In United States v. Page, 10 Cir. 1965, 350 F.2d 28, the contractor (in that case, the United States) was found to be lacking in the requisite control for the imposition of liability. There the government had the right, under the contract, to impose additional safety measures not articulated in the contract, and to inspect the work as it progressed. But Ronlee, under its contract, had full authority to control activities so as to insure compliance with the Corps of Engineers safety manual. It could stop, start, alter, or modify anything done in order to satisfy that affirmative duty. Likewise, in Sword v. Gulf Oil Corporation, 5 Cir. 1958, 251 F.2d 829, another case cited by Ronlee, the contract in question specifically said that the independent contractor had full authority to control and direct the work and that defendant Gulf was interested "only in the results."

■ We address briefly Ronlee's additional arguments with respect to its negligence liability. First, Ronlee follows the government's lead with respect to the causation issue discussed supra, Part II, and a remand on that point has been found necessary. Second, it is suggested that the actual injuries in this case, assuming Ronlee negligent, were really the effect of intervening or superseding negligence by Herbert Law, which would absolve Ronlee of liability. It is said to be superseding because Law testified that he would have detonated the charges at barge No. 1 even if he had known that the other barge was still drilling. This proposed mode of analysis garbles what we perceive to be the

law of superseding cause. We think that "the problem is one of whether the defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, *for which he is not responsible.*" Prosser, Law of Torts, Sec. 51, Intervening Causes, at 309 (3d ed. 1954) (emphasis supplied). The answer to Ronlee's claim lies in the italicized portion of the quote, as Ronlee *was responsible* for the fact that Herbert Law would have detonated despite continuing work at the other barge. But for the negligent disregard of an affirmative duty to insure that blasting was not done in a dangerous manner, e. g. while work was being done at the other barge, the plaintiffs would not have been injured. The action of Herbert Law can hardly be termed superseding under these circumstances.

We find that Ronlee had the requisite authority to control the safety procedures employed at the job site, and that its failure to exercise it was negligence which proximately caused the plaintiffs' injuries. We also note that the district court also apparently premised Ronlee's liability upon an alternative ground, the violation of a non-delegable duty to insure compliance with the Corps of Engineers safety manual. To the extent that this agrees with our interpretation of Ronlee's obligation under the prime contract, which we hold could not be delegated by the vehicle of a subcontract putting the parties in the respective positions of the original parties, we approve that holding.

### V  APPEAL BY E. & I.

The contentions raised by E. & I. not already discussed supra do not require extensive exposition. It is suggested by E. & I., though by none of the other parties, that the district court lacked admiralty jurisdiction to hear this case. There is no assertion that the waters upon which the accident took place were not navigable, nor that the workers were not seamen. Rather, E. &

I.'s brief contains a bare conclusory statement, not fully intelligible, to the effect that jurisdiction was lacking, with citation to several authorities. We find nothing in the cited cases to persuade us that the lower court erred in exercising jurisdiction. See, Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 1972, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454. Maritime locality and a relationship between marine blasting and traditional maritime activity, both present in this case, satisfy the jurisdictional requirements listed by the Supreme Court in *Executive Jet Aviation.*

E. & I. occupies essentially the same position as Ronlee in this litigation, i. e. a contractor who delegated an entire portion of contract work to a subcontractor, keeping neither personnel nor equipment at the work location. In subsection (a) of section 5 of the contract between Ronlee and E. & I. (quoted in Part III hereof, supra) it was agreed that E. & I. would assume all obligations and responsibilities owed by Ronlee to the government. This, in turn, meant that E. & I. was obligated to honor section 40(d) of the prime contract, which stipulated that Ronlee (and hence E. & I.) would assume responsibility for subcontractors' compliance with applicable safety regulations. In a sense, then, each contractor undertook a non-delegable duty to insure that proper safety procedures were observed, regardless of subcontracts. Both Ronlee and E. & I. were found liable on this ground, while Cross sustained liability on the alternative grounds of respondeat superior and unseaworthiness.

### VI  APPEAL BY CROSS

The only issue raised by Cross on appeal is the question of indemnity. Since that point is fully covered by Part III, supra, discussion of Cross' appeal need not be undertaken.

### VII  CROSS–APPEAL BY PLAINTIFFS LAW AND SMITH

At issue here is the finding of contributory negligence on the part of

these two plaintiffs. The district court stated in Finding of Fact 20:

> "Both Leslie Smith and Joseph Law were contributorily negligent. They were negligent in waving as they did just prior to the blast from barge No. 1. They were not in a safe position and they should have known that arm waving could indicate to barge No. 1 that barge No. 2 was ready for barge No. 1 to blast."

The underlying but unstated assumption in the above finding is that the waving by the two named plaintiffs to each other played a legally causal role in the accident which ensued. From much of the evidence, it would be plausible to infer that the waving was mistaken by Herbert Law at barge No. 1 as the improvised signal for indicating recognition that charges were about to be detonated. Thus one might conclude that the good-bye waves constituted the final step in the chain of events which ended with Herbert Law's detonation of the charges at barge No. 1.

We find the above logic defective and reverse the district court's finding in this respect as being erroneous as a matter of law. The law of contributory negligence is no different from that of ordinary negligence when it comes to causation. None would argue with Prosser's statement that:

> "Causation is a fact. It is a matter of what has in fact occurred. A cause is a necessary antecedent: in a very real and practical sense, the term embraces all things which have so far contributed to the result that without them it would not have occurred." Prosser, Law of Torts, Sec. 41 Causation in Fact, at 241 (3d ed. 1964).

Stated in more familiar terms, negligence leads to liability only if the injuries would not have occurred but for the act of negligence. But, as revealed by Herbert Law's testimony at trial, causation was absent in this situation:

> "Q. Mr. Law, I believe your first answer to the question, you just answered counsel you wouldn't have shot if you had known the other barge was still drilling; is that correct?
>
> A. I will rephrase that; we would have shot.
>
> Q. You rephrase it or you just changed the answer?
>
> A. Well, I changed it, whatever way.
>
> Q. There would have been some doubt in your mind, however, about shooting, then; is that not correct?
>
> A. No; no doubt. We would have shot. We had been doing it all the time, so I know I wouldn't have changed."
>
> App. at 491–92.

The quoted testimony makes clear that the waving by Joseph Law and Smith was not a factor in the chain of causation. It did not cause Herbert Law to detonate the charge at barge No. 1. Accordingly, the district court was in error in determining that it constituted contributory negligence.

## VIII CONCLUSION

We summarize our holdings briefly: (1) the judgment of liability as to the United States, Ronlee, and E. & I. is remanded for further findings of fact with respect to the issue of causation; (2) the independent finding of liability as to Cross is affirmed; (3) the finding as to indemnity by virtue of the contract clause between each of the contracting parties is affirmed; and (4) the finding of contributory negligence as to plaintiffs Law and Smith is reversed.

Affirmed in part, reversed in part, and remanded with directions.