**Joseph WERDEHAUSEN,**
**Plaintiff–Respondent,**

v.

**UNION ELECTRIC COMPANY,**
**Defendant–Appellant.**

No. 56983.

Missouri Court of Appeals,
Eastern District,
Division Three.

Oct. 30, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 19, 1990.

Application to Transfer Denied
Feb. 7, 1991.

Paul S. Brown, T. Michael Ward, Mark Lawson, St. Louis, for defendant-appellant.

Elmer C. Oberhellmann, St. Louis, for plaintiff-respondent.

SATZ, Presiding Judge.

This is a personal injury action involving the duty of an employer to an employee of an independent contractor. Defendant-employer, Union Electric Company (UE), appeals from a money judgment in favor of plaintiff, Joseph Werdehausen, an employee of the independent contractor, Daniel International Corporation (Daniel). We reverse.

By written contract, UE hired Daniel to do construction work on UE's Callaway Nuclear Power Plant. Plaintiff, a pipefitter, was injured on the construction site while working for Daniel. Plaintiff was walking under a scaffold when a man on the scaffold, apparently another Daniel's employee, unintentionally kicked a large piece of wood off of the scaffold. The wood fell 30 feet, struck and broke through plaintiff's hard hat, cut plaintiff's head and, according to plaintiff's evidence, seriously injured his cervical spine.

Plaintiff's evidence showed the wood fell from the scaffolding because the scaffolding had no toe boards. A toe board is a safety device nailed to a scaffold to prevent objects from falling off the scaffold.

### Plaintiff's Submitted Theory of Liability

UE contends that plaintiff failed to show it had a duty of due care to plaintiff, and, therefore, UE contends, plaintiff failed to make a submissible case. To state the obvious, this contention raises the threshold issue of plaintiff's submitted the-ory of UE's liability. The record does not reveal plaintiff's theory with complete clarity.

To us, plaintiff's verdict directing instruction submits a garbled claim under § 414 of the Restatement (Second) of Torts (1965).[1] Section 414 subjects to liability an employer who hires an independent contractor to do work but "retains control over any part of the work" and, then, fails to exercise his control with reasonable care, causing injury "to others".[2] The verdict directing instruction submitted to the jury states:

In your verdict you must assess a percentage of fault to Defendant Union Electric, whether or not Plaintiff Joe Werdehausen was partly at fault, if you believe:

First, Defendant Union Electric entered into a contract with Daniel on July 16, 1975 for construction work to be performed by Daniel, and

Second, Defendant Union Electric had authority to stop any work operation of Daniel which failed to comply with the Occupational Safety and Health Act of 1970 and applicable amendments, and

Third, the Occupational Safety and Health Act of 1970 [1926.451] requires toe boards and wire mesh and guard rails to be installed on all open sides and ends of scaffolds more than ten feet above the ground floor, and

Fourth, scaffold number 62 was more than 10 feet above the ground floor and did not have toe boards and wire mesh and guard rails on all open sides and ends, and, as a result the area beneath scaffold number 62 was not reasonably safe for persons walking beneath scaffold number 62, and

Fifth, Defendant Union Electric knew or by using ordinary care could have known of this condition, and

---

1. All references to the Restatement are to the Restatement (Second) of Torts (1965) unless stated otherwise.

2. "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."
Restatement § 414

Sixth, Defendant Union Electric failed to stop work operations until toe boards and wire mesh and guard rails were installed on scaffold number 62, and

Seventh, Defendant Union Electric was thereby negligent, and

Eighth, as a direct result of such negligence, plaintiff Joe Werdehausen was injured.

We read this instruction as imposing a duty of due care on UE to plaintiff, derived from UE's retained contractual power to stop any unsafe work of the independent contractor, Daniel. However, in the copy of this instruction made part of the record, plaintiff cites three separate sections of the Restatement and a federal case to support the instruction:

NOT IN MAI Restatement (Second) of Torts sections 414, 422, and 428. *Donovan vs. General Motors*, 762 F.2d 701 (8th Cir.1985) section 414, *Donovan vs. General Motors*, 762 F.2d 701 (8th Cir. 1985)

Submitted by Plaintiff.

Rather than illuminating plaintiff's submitted theory of UE's duty, these citations obfuscate it.

We have synopsized an employer's duty to an employee of an independent contractor under § 414. Section 422 subjects a landowner to liability to an employee of the independent contractor for injury caused "by the unsafe condition of the structure" if the landowner retains "possession" of the land during the progress of the work. The duty of the landowner extends to "persons upon the land, such as invitees, to whom the possessor owes such a duty." *Id.* Comment a. However, "[p]ossession usually is surrendered fully in the cases of construction ... work." *Id.* Comment c.

■ UE owned the land upon which the power plant was being built. We do not, however, read plaintiff's verdict directing instruction as submitting the element of UE's, actual or constructive, retained "possession" of the land and, thus, do not find the instruction to be a submission of a § 422 claim.

■ Section 428 subjects a franchisee to vicarious liability "for physical harm caused [to others] by the negligence of a contractor employed to do work in carrying on the activity." UE was permitted to build and operate the nuclear power plant by a permit from the Nuclear Regulatory Commission (NRC). Plaintiff's instruction, however, does not submit the issue of UE's vicarious liability for Daniel's negligence.

The *Donovan* case provides no more illumination than the cited sections of the Restatement. *Donovan* is a diversity case brought under Missouri law. The employee of an independent contractor sued the landowner-employer for injuries the employee sustained while working on the land of the employer-landowner. The appellate court reversed the trial court's submission of plaintiff's case under § 343 of the Restatement. Section 343 defines the liability of a possessor of land to an invitee for a dangerous condition on the land. "As applied [in Missouri] to an employee of an independent contractor", the court said, "§ 343 is referred to as the 'safe work-place' doctrine, under which one who contracts with an independent contractor has a duty to provide a safe workplace for the employees of the independent contractor." *Id.* at 704. In Missouri, the court said, this principle applies to conditions that pre-exist the independent contractor's coming on to the premises and, therefore, was not applicable to the facts there.

The court, however, found sufficient evidence to support a submissible case under §§ 414 and 422. "Of course", the court said, "the instructions on retrial will depend on the evidence introduced." *Id.* at 705.

*Donovan's* relevance here, if any, is that plaintiff could not submit a claim under § 343 but could submit claims under §§ 414 and 422, on properly supporting evidence. We need not address the propriety of *Donovan's* holding or teaching. The record before us discloses plaintiff submitted one instruction with one claim. Moreover, neither *Donovan* nor plaintiff in his brief demonstrates the meaningful difference between a § 343 and a § 422 claim. And,

plaintiff does not argue that UE's retained contractual power to stop unsafe work constitutes retained possession under § 422.

Furthermore, we are not aided by the record of the instruction conference before us. When asked by the trial court whether he had any objections to "any instructions", plaintiff's counsel, Mr. Oberhellman, responded: "No, I do not." However, a Mr. Becherer, apparently also speaking for the plaintiff, objected to the trial court's refusal of an "Instruction A" which, according to Mr. Becherer, submitted "two theories" of liability that "could have been submitted together". The record before us, however, does not disclose Mr. Becherer as co-counsel for plaintiff, "Instruction A" is not part of the record before us, and the meaning and legal effect of the instruction conference is not developed in plaintiff's brief on appeal.

To make the waters murkier, plaintiff finds a § 414 in Count III of his fourth amended petition, but UE finds this claim in Count V of the petition. This difference is understandable. To say the least, plaintiff's petition is not a model of clarity. Although Count III is captioned: *RETAINED CONTROL OF WORK*, its allegations, by incorporation, plead "inherently dangerous" activities or conditions of work and base UE's liability on vicarious liability, the "negligent acts of Daniels (sic) International as [if] those such acts had been its own". Section 414 contemplates neither "inherently dangerous" activities nor vicarious liability.

Count V of plaintiff's petition, referred to by UE, contains allegations in forty separate paragraphs and more than ten additional subparagraphs. Neither party has explained the meaning of this prolixity.

Our pleading principles may have abolished the technicalities of pleading. They have not abolished the need for clear thinking and clarity.

We take the record as we find it and address those issues we believe have been joined by the parties. Plaintiff's chosen theory of liability, as reflected in his verdict directing instruction, was a claim under § 414.

Both parties assume that we, in Missouri, have adopted § 414 in detail. No Missouri court, however, has expressly adopted § 414, although this Court, in dicta, has recognized its applicability with approval. *See, Barbera v. Brod–Dugan Co.*, 770 S.W.2d 318, 323–324 (Mo.App.1989). And, certainly no Missouri court has approved the employer's liability under § 414 to include liability to the employees of the independent contractor. *Id.* at 323, fn. 3. For our purposes here, however, we will assume § 414 applies and we will also assume the duty of employers under this Section runs to the employees of the independent contractor.

### UE's Argument

■ UE contends that plaintiff failed to make a submissible case. In particular, UE contends that plaintiff failed to show UE owed plaintiff a duty of due care. We agree.

Originally, at common law, an employer of an independent contractor was not liable for the physical harm caused to another by the conduct of the contractor. The employer's freedom from liability was based primarily on his lack of control over the manner in which the contractor performed his work. Exceptions at common law have developed which have almost swallowed this rule. The Restatement has attempted to categorize these exceptions in §§ 409–429. A number of the Restatement Sections, however, are not exceptions to the original common law rule at all. They simply categorize the liability of the employer for his own negligence in selecting, instructing or supervising the contractor. *See* §§ 410–415.

As previously stated, § 414 imposes liability on an employer who hires an independent contractor to do work but "retains control over any part of the work," and, then, fails to exercise his control with reasonable care, causing injury "to others." The nature and extent of the retained control necessary to create exposure to liability is further defined in the Comments to the Section. The degree of control retained

may be less than that which would be necessary to subject the employer to liability as a master, § 414, Comment a, and, therefore, is consistent with a generally independent contractor relationship. The employer *may be* liable even if he retains "only the power ... to forbid [the work] being done in a manner likely to be dangerous to himself or others." *Id.* However, in defining the precise nature and extent of the necessary control, Comment c states that

> the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.

In short, Comment a states that liability *may be* based on the power to forbid the work from being done in a dangerous manner, and Comment c states *it is not* enough that the employer has merely a general right to order the work stopped or resumed.

This seemingly facial inconsistency between the Comments makes the concept of control amorphous, but no more amorphous than some other legal concepts, and, thus, not unworkable. There is general agreement that if the employer retains "only the right to inspect the construction work to see that the contract specifications are met while the independent contractor controls how and when the work is to be done, there is probably not sufficient retained control to subject [the employer] to liability." *Moloso v. State*, 644 P.2d 205, 211 (Alaska 1982); *See also DeVille v. Shell Oil Co.*, 366 F.2d 123, 125–126 (9th Cir.1966). "Similarly, if the employer retains only standard 'boilerplate' provisions with respect to safety inspections and requirements, but assumes *no* affirmative duties with respect to safety and never directs the method of performance, there is insufficient control" to render the employer liable for injury caused by unsafe performance of the work. (emphasis theirs) *Moloso, supra; See e.g.,*

*Morris v. City of Soldotna*, 553 P.2d 474, 480 (Alaska 1976).

■ On the other hand if the employer assumes an affirmative duty to implement safety precautions, by contract or conduct, the employer is liable for injuries caused to others by the unsafe performance of the work if it negligently allowed the unsafe work to continue. *See, e.g., Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890, 896 (Wyo. 1986); *Hammond v. Bechtel Inc.*, 606 P.2d 1269, 1276 (Alaska 1980).

Plaintiff bases his claim in part on Section 40 of the contract between UE and Daniel. Section 40, captioned *"Responsibility for Work: Precautions,"* requires Daniel to employ a safety supervisor acceptable to UE, to "take precautions" against unsafe conditions created during construction, to continuously inspect "work, materials and equipment", to determine and correct unsafe conditions and to comply with all applicable safety laws and regulations, including the "rules, regulations and standards [of] the Occupational Safety and Health Act" (OSHA). Under Section 40, UE retains the power to stop the operations of Daniel or any subcontractor "[u]pon the failure" of Daniel or subcontractor to comply with these requirements. (See Appendix I)

Plaintiff's theory, as reflected in his verdict directing instruction, was that under Section 40, UE had retained "authority to stop any work operation of Daniel which failed to comply with [OSHA]." This, according to plaintiff, was an operative fact showing UE had retained sufficient control over Daniel's work to expose UE to possible liability to plaintiff.

There is a split of authority as to whether, under § 414, an employer exposes himself to liability by retaining the power to forbid or stop the work of the contractor the employer believes to be unsafe. Several courts have held that merely retaining the power to forbid or stop work from being done in an unsafe manner is not a sufficient degree of retained control to expose the employer to liability. *See, e.g., State v. Morris*, 555 P.2d 1216 (Alaska

1976); *Orr v. United States*, 486 F.2d 270 (5th Cir.1973); *Hood v. Hess Oil Virgin Islands Corp.*, 650 F.Supp. 678 (D.Ct. Virgin Islands 1986). However, there are a few jurisdictions which would expose the employer to liability on this degree of retained control. *See, e.g., Claudy v. City of Sycamore*, 170 Ill.App.3d 990, 120 Ill.Dec. 812, 524 N.E.2d 994 (1988); *Pasko v. Commonwealth Edison Co.*, 14 Ill.App.3d 481, 302 N.E.2d 642 (1973).

We agree with the result reached by the former courts. The latter courts rely on the example in Comment a of § 414 which states the "power to forbid work from being done in a manner likely to be dangerous" *may be* a sufficient degree of retained control to impose liability. Those courts read this statement as a compelling example. *Pasko* 302 N.E.2d at 648. However, the operative term in Comment a is "may be" liable not "is" liable. The employer's retention of the power to forbid or stop work from being done in an unsafe manner, thus, does not necessarily expose the employer to liability.

▌ Arguably, the power of an employer to forbid or stop work from being done in an unsafe manner, in effect, can control the operational manner in which the work is being done. The employer simply forbids the work from being done until it is done in a manner acceptable to him. But, this is an unacceptable interpretation of the employer's retained power to forbid or stop the work. The power, vis-a-vis employer and independent contractor, is privileged if it is exercised to stop work being done in an unsafe manner; and, if it is so exercised, the employer is immune from liability to the contractor. The employer, however, is not privileged to exercise his power in any way he deems fit. If he exercises it other than as defined, he loses his privilege and, in turn, loses his immunity and subjects himself to liability to the contractor. In short, the power to stop the work from being done in an unsafe manner is a privileged power. The employer may only stop the work from being done in the unsafe manner chosen by the contractor. The contractor is still free to choose any other manner of doing the work so long as it is safe.

The control test, however, should not be overemphasized. The degree of control is, indeed, a critical factor. But, equally critical factors are also found in other reasons we expose an employer to liability. These reasons parallel or, perhaps, underpin our focus on the degree of control.

▌ Whether the control that an employer has the power to exercise is sufficient to impose liability depends upon the reasons liability is being imposed in the first place. We impose *vicarious liability* on the master for the acts of his servant because the master actually controls his servant and, thus, imposing liability on the master is consistent with our keystone tort principle of imposing liability for fault. Additionally, however, the imposition of vicarious liability theoretically and, perhaps, practically encourages the master to supervise his servant properly and, thus, promotes accident prevention. Furthermore, as one commentator contends, "the chief warrant for vicarious liability must be found in the principle that an enterprise (and its beneficiaries) should pay for the losses caused by the risks that it creates (even without its fault)." Harper and James, *The Law of Torts*, § 26.11, p. 72 (2d ed. 1986).

▌ These considerations are also relevant when determining what risks are fairly allocable to an employer in an enterprise in which the employer retains "some" control over the operational detail of the work his independent contractor is hired to do. And, an additional consideration is whether the work in question is part of the regular business of the employer. Certainly, an employer is free to farm out any of his work. He does so when he employs an independent contractor. If he does not commonly or regularly farm out the work in question, there are fewer societal reasons and established legal principles to expose him to liability for the work being done in an unsafe manner.

▌ Section 414 contemplates these considerations. It makes a clear distinction between the employer-independent contrac-

tor relationship and the contractor-subcontractor relationship. *Compare* Comments a and c to Comment b. The Restatement notes that a principle contractor will quite often "superintend[ ] the entire job" he farms out to his subcontractors. If he does so, he "is subject to liability if he fails to prevent the subcontractors from doing even the details of the work" in a manner dangerous to others. § 414, Comment b. This simply recognizes the fact that a principal, prime or general contractor is knowledgeable and experienced in the work he is hired to do and which he farms out to his subcontractors. Thus, our sense of fairness is not disturbed by exposing the contractor to liability as reflected in Comment b. *See* e.g. *Smith v. United States*, 497 F.2d 500 (5th Cir.1974); *Kelley v. Wright Const., Co.*, 90 Wash.2d 323, 582 P.2d 500 (1978). The best way to ensure that safety precautions are taken is to make the general contractor responsible for them.

> Placing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas.

.     .     .     .     .

> We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen.

*Id.* 582 P.2d at 505–506 quoting *Funk v. General Motors Corp.*, 392 Mich. 91, 220 N.W.2d 641, 646 (1974).

Applying these factors to the present facts compels the conclusion that the nature and extent of control retained or exercised by UE was insufficient under § 414 to impose a duty on UE to plaintiff.

First, from the record, it is clear that UE itself never built a power plant before. Thus, there is little or no reason to infer that UE would have the knowledge or expertise to distinguish between safe and unsafe methods of carrying out the work necessary to construct the plant. Apparently, in recognition of this, UE hired Daniel as one of its independent contractors and, by contract, made Daniel responsible for the safe performance of Daniel's work. Under these circumstances, creating liability in UE would not significantly promote accident prevention.

Second, although UE did retain power to stop work which did not comply with safety rules and regulations, Daniel was free to choose any safe method for performing its work.

Third, plaintiff did not cite, and our review of the record has not disclosed, any examples of UE actually stopping unsafe work or any examples of other conduct by UE which would create an assumed duty to control the detailed manner of performing Daniel's work safely. In his brief, plaintiff states UE did exercise its authority and required "independent contractors" to correct hazards. This statement, however, is not supported by the pages of the transcript plaintiff cites. The discussions on those pages were based upon hypothetical questions asked of Mr. Walter Weber, UE's nuclear construction manager. His answers did nothing more than show that UE had the power to stop work to be or being done in an unsafe manner. Nowhere on those pages does Mr. Weber testify that UE ever actually ordered any safety hazard corrected nor that any corrections be done in a manner dictated by UE.

▆ Under the contract between UE and Daniel, plaintiff notes, Daniel was required to designate one of its employees as Safety Supervisor. UE had the right, however, to approve or disapprove of the selection, and, according to Mr. Weber, UE could refuse to reimburse Daniel for the Safety Supervisor's salary, if UE subsequently became dissatisfied with his performance. This, plaintiff argues, shows UE had great control over safety in addi-

tion to its power to stop work from being done in an unsafe manner. Plaintiff's argument is not persuasive.

UE could properly refuse reimbursement only if the Safety Supervisor did not prevent the work from being done in violation of applicable safety rules and regulations. The Safety Supervisor was free to choose any method of performing the work so long as it complied with those rules and regulations. Thus, UE did not control the operational details of performing the work.

■ Plaintiff also contends that UE was required to control the manner in which the work was done by the permit the Nuclear Regulatory Commission (NRC) issued to it. The NRC permit allowing UE to build a nuclear plant required UE to exercise "direct control over construction activities at the plant." This requirement, plaintiff argues, created a nondelegable duty of control imposed on UE. UE's duty under the permit, plaintiff contends, is similar to a duty imposed by statute or ordinance. Plaintiff cites *Virgil v. Riss & Co.,* 241 S.W.2d 96, 99 (Mo.App.1951) and *Brown v. Commerce Trust Co.,* 9 F.R.D. 317, 318 (W.D.Mo.1949).

Plaintiff's argument, as we understand it, invokes the principle that one who carries on an activity "which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity." Restatement § 428; *See Virgil, supra.* Thus, so goes the argument, since a nuclear power plant can be constructed only under an NRC permit and the permit here required UE to control construction activities, UE could not delegate its control and, consequently, UE is

liable for plaintiff's injuries. Again, this argument is not persuasive.

Under this theory, UE's liability would be vicarious. This Section would subject UE to liability for that harm caused by the negligence of Daniel, the contractor. *See* Restatement § 428. Plaintiff has not cited any evidence in the record showing how Daniel was negligent. Moreover, the question whether plaintiff's injuries were caused by any negligence of Daniel's was not submitted to the jury. Thus, as we read the record, plaintiff did not submit this theory of liability to the jury or argue it to the trial court. Therefore, we may not affirm on this basis. *Carter v. Matthey Laundry & Dry Cleaning Co.,* 350 S.W.2d 786, 795 (Mo.1961); *State ex rel. Ricker v. Trenton Jr. Coll. Bd. of Trustees,* 622 S.W.2d 787, 789 (Mo.App.1981).

■ Furthermore, plaintiff has not cited to any evidence in the record showing exactly what is meant in the NRC permit by "direct control over construction activities." Indeed, the section of the permit requiring UE to have direct control suggests the purpose of the control was to maintain the quality of the work, not the safety. After requiring UE to have direct control over the construction activities, the section discusses UE's duties and programs relating to quality assurance. According to plaintiff's testimony, quality assurance meant UE personnel were "overseeing and inspecting and instructed on how to do things." As an example, plaintiff said UE personnel would instruct him on the proper sequential pattern for tightening bolts on flanges and ensure the wrench he used in the process was set to the proper pounds per square inch of torque.[3] Sensibly read, the permit says nothing about any duties UE has regarding safe construction methods, and plaintiff does not show how the permit can be read differently.[4]

---

3. In UE's case, Mr. Morgan Doyne, General Superintendent Callaway Construction for UE also testified about what quality assurance meant. According to Mr. Doyne, "Quality Assurance was a program implemented and enforced by the United States government which had to do with the protection of the public from radiation.... [T]his is a very limited type of activity."

4. Plaintiff has filed a motion to strike certain statements from UE's reply brief. The statements describe the nature of control contained in the NRC permit and cite to the entire permit. The permit is contained in the Supplemental Legal File on appeal and comprises 100 pages. Plaintiff argues only two pages of the permit

Plaintiff also notes UE had 1,500 "employees" on the construction site, citing the testimony of Mr. Walter Weber. Mr. Weber testified that, at one time, UE had 1,500 employees at the construction site, but that number included "UE and contracted in employees.... Some were independent contractors where they were contracting in services to work under Union Electric." The plaintiff established these employees "[g]enerally" wore white hats that UE had, but he did not establish what these 1,500 employees did. Absent some showing what these employees did, the mere fact that there were 1,500 of them is not particularly probative on the question of UE's control. More important, perhaps, if the record supports any inference, the inference is that UE's employees were on the construction site for quality assurance.

Out of the thousand or more pages of transcript before us, Mr. Weber was asked on cross-examination whether "in 1982 a surveillance program was started by Union Electric on the various safety related items on [the] power plant", and he answered "we had surveillances that went along from the beginning." What this isolated exchange means is unclear. Even interpreting this exchange in the light most favorable to plaintiff, it can mean no more than UE was implementing, in an unknown manner to an unknown degree, its retained power to forbid work from being done in violation of applicable safety rules and regulations. Nothing here nor anywhere else cited by plaintiff shows or implies UE attempted or did dictate the manner unsafe work was to be corrected. On this record, Daniel was free to choose its own method of correction, if a correction were necessary.

Plaintiff argues we must affirm if the judgment of the trial court can be supported under any theory advanced in the pleadings or supported by the evidence. The cases plaintiff cites in support of this argument are court tried cases, and, therefore, any principles they support are not necessarily relevant to this jury tried case. However, on rare occasions, we may remand a jury tried case for further proceedings when a plaintiff fails to make a submissible case on his chosen theory. *State ex rel. Div. of Fam. Serv. v. Standridge,* 676 S.W.2d 513, 517 (Mo. banc 1984).

We see no reason to apply this practice here. As a court, we are obliged to remain impartial. We are not permitted to become a witting or unwitting adversary of UE, fashion a theory we are not certain plaintiff pleaded, search the record on our own for evidence to support that theory and impose liability upon UE without affording it any opportunity to challenge our strange conduct.

Judgment reversed.

SMITH and GRIMM, JJ., concur.

## APPENDIX I

### SECTION 40. RESPONSIBILITY FOR WORK: PRECAUTIONS.

Daniel shall promptly take precautions which are necessary and adequate against any conditions created during the progress of Daniel's activities hereunder which involve a risk of bodily harm to persons or a risk of damage to any property and shall designate an employee as safety supervisor who is acceptable to Owner. Daniel shall continuously inspect work, materials and equipment to discover and determine any such conditions and shall be solely responsible for discovery, determination and correction of any such conditions. Daniel shall comply with applicable safety laws, standards, codes and regulations in the jurisdiction where the work is being performed specifically, but without limiting the generality of the foregoing, with rules, regulations and standards adopted pursu-

were read into evidence, and, thus, the rest of the permit is not in evidence.

In our analysis, *supra,* we rely only on the portion of the permit plaintiff contends was in evidence. Thus, in that sense, the motion is moot. However, we also note the stipulation by counsel for both parties accompanying the Supplemental Legal File states the permit was received into evidence as plaintiff's exhibits 42, 43 and 44. Thus, according to the record, the entire permit was received into evidence. Plaintiff's motion is therefore denied.

ant to the Occupational Safety and Health Act of 1970 and applicable amendments.

Upon the failure of Daniel or subcontractors to comply with any of the requirements of this Section, Owner shall have the authority to stop any operations of Daniel or subcontractors affected by such failure until such failure is remedied.