22 F.3d 832
 Todd STEPHENS, Plaintiff-Appellee,
v.
CROWN EQUIPMENT CORPORATION, doing business as Crown
Controls Co., Inc., doing business as Crown
Controls Corporation, an Ohio
corporation, Defendant,
Bridgestone/Firestone, Inc., an Ohio corporation, doing
business as Firestone Tire & Rubber Co.,
Defendant-Appellant.
 No. 93-1828.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1993.
Decided April 28, 1994.
 
 August B. Landis, Des Moines, IA, argued, for appellant.
 George F. Davison, Jr., Des Moines, IA, argued, for appellee.
 Before LOKEN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Todd Stephens was injured while working at a warehouse owned and operated by Bridgestone/Firestone, Inc. ("BFI"). Stephens sued BFI for personal injury, and the jury found in his favor. BFI appeals, arguing that the district court erred in denying its motions for directed verdict and judgment as a matter of law. It appeals as well the denial of its motion for a new trial on the ground that there was insufficient evidence to support the jury's award of $500,000 for loss of future earning capacity. We believe that the damages award for loss of future earning capacity lacks an adequate basis and remand for a remittitur in that regard, but affirm the remainder of the judgment in its entirety.
 
 
 2
 Stephens suffered serious injuries to his left foot and ankle on January 20, 1989, while operating a forklift at Midwest Distribution Center, Inc., ("Midwest") a warehouse owned and operated by BFI in Des Moines, Iowa. At the time of the injury, Stephens was employed by Action Warehouse Company, Ltd., ("Action") an independent contractor. Pursuant to a contract with BFI, Action provided labor services at Midwest, among them receiving, storing, and preparing tires for shipment. All of the equipment, tools, and supplies in the warehouse, including the forklift Stephens was operating when he was injured, was owned by BFI. Work assignments in the warehouse were made by BFI using computer-generated "pick cards," which directed employees to locations in the warehouse where tires could be found and told them ultimately what to do with them. Stephens was injured when, while attempting to complete his pick card assignment for the day, he tried unsuccessfully to avoid hitting a concrete wall and wedged his foot between the forklift and the wall. Prior to the accident, he had neither operated the particular type of forklift he was on nor had he received extensive training on it.
 
 
 3
 The basis of Stephens' argument at trial was that BFI retained sufficient control over the work being performed by Action employees at Midwest to subject BFI to liability for his injuries. The jury was given special verdicts and returned a verdict in Stephens' favor. It found that BFI retained the right to exercise control over the manner and method of training Action employees in the operation of forklifts at Midwest and/or in the way in which they were to carry out their jobs. Among the damages awarded by the jury was $500,000 for loss of future earning capacity.[1] After reducing the total amount of damages awarded by twenty percent, the amount of fault the jury attributed to Stephens, judgment was entered in Stephens' favor in the amount of $560,353.56.
 
 
 4
 Two issues are presented for our consideration. First, whether, as a matter of law, there was enough evidence for the jury to find that BFI exercised sufficient control over Action employees to render it liable for Stephens' injuries. Second, whether the evidence was sufficient to support the jury's award of $500,000 for Stephens' future lost earning capacity.
 
 I.
 
 5
 In ruling on a motion for judgment as a matter of law or, alternatively, for new trial, the court "must view the evidence most favorably to the non-moving party and give it the benefit of all reasonable inferences to be drawn from the record." Cope v. Burlington N. R.R., 907 F.2d 67, 68 (8th Cir.1990). The court is "not free to weigh the evidence, to pass upon the credibility of witnesses or to substitute [its] judgment for that of the jury." Id. A jury verdict may be set aside "only when there is no evidence of substance upon which reasonable persons could differ." Id.
 
 
 6
 Under Iowa law, an owner of property ordinarily is not liable for injuries to the employee of an independent contractor for injuries arising out of the contractor's negligence. Downs v. A & H Constr. Ltd., 481 N.W.2d 520, 524 (Iowa 1992). However, when the owner entrusts work to an independent contractor and retains some degree of control over any part of the work, he may be liable to the independent contractor's employee for physical harm caused by the owner's failure to exercise his retained control with reasonable care. Id. at 524-25 (citing Restatement (Second) of Torts Sec. 414). The degree of control an owner of property has is the critical, defining issue:
 
 
 7
 "It is not enough that [the employer] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."
 
 
 8
 Id. at 525 (quoting Restatement (Second) of Torts Sec. 414(c)) (emphasis added).
 
 
 9
 We find that the evidence in the record supports the jury's finding that BFI retained the requisite control over the work performed by Action employees to render it liable for Stephens' injuries. The services performed by BFI personnel at Midwest, contrary to BFI's assertion, were not limited to (although they indisputably included) goal setting and other administrative functions.[2]
 
 
 10
 Perhaps the most compelling evidence of BFI's "retained control" was its use of computer-generated "pick cards" to make daily work assignments. The pick cards were detailed orders listing the exact storage location of tires in the warehouse, their product codes and descriptions, and their ultimate destinations, both within the warehouse (loading doors) and outside of it (retail and other businesses). BFI's foreman at Midwest, Gary Eischeid, evaluated the cards and passed them on to Action supervisors, who in turn passed them on to Action employees, who relied exclusively on the information in the cards to perform their work. The pick cards provided all of the information needed for Action employees to complete their daily assignments, and, indeed, were vital to their ability to function at all.[3] Upon finishing the jobs described in the pick cards, employees returned the cards to BFI's office at Midwest; the cards assured BFI that the work had been assigned and completed.
 
 
 11
 Further evidence that BFI retained control over the work performed by Action employees is the fact that BFI owned and assumed maintenance responsibilities for all of the equipment in the warehouse, including the forklift Stephens was operating when he was injured. Significantly, BFI, at the request and upon the recommendation of its officers at Midwest, purchased the particular type of forklift Stephens was operating because of its stand-up feature, which allowed the forklift to be more easily maneuvered in narrow aisles. BFI officers apparently believed that narrower aisles at Midwest would allow for more storage space, which would ultimately allow for greater productivity on the part of Action employees.
 
 
 12
 Relying on Downs, 481 N.W.2d 520, BFI argues that mere ownership of the forklifts is insufficient to show that BFI had control over Action employees. We find Downs to be distinguishable from the present case. Here, unlike Downs, BFI had near exclusive control over the forklifts and had reason to know of their safety or lack thereof. In Downs, the defendant contractor was found to have no control over the construction of scaffolding on which the employee of a subcontractor was injured, and was therefore found not to be negligent. Id. at 525. The court, in rejecting the injured employee's argument that the contractor's ownership of part of the scaffolding imputed to the contractor a duty of care, relied heavily on the fact that the subcontractor and its employees constructed the scaffolding (and therefore had control over it). Id. Conversely, in the instant case Action did not assemble, own, maintain, or otherwise exert control over the forklifts, apart from overseeing their use by Action employees.
 
 
 13
 Additional evidence that BFI retained the requisite control over Action employees is in the contract between BFI and Action. Article I of the contract provides that BFI "shall have the right to expand, reduce or alter the scope of work as set forth ... including the increase or decrease of the number of employees utilized by Action...." V Jt.App. at 912. In this regard, we find it noteworthy that BFI maintained management staff at the warehouse at all times.
 
 
 14
 Having found that the evidence, as a matter of law, was sufficient to support the jury's finding that BFI retained control over the work performed by Action employees, we turn to the issue of whether BFI breached its duty of care to properly train Action employees. We believe that a jury could find that BFI was negligent in providing the training necessary for the safe operation of the forklifts. BFI received extensive training on the use of the Crown narrow-aisle forklift from the dealer when it initially purchased the forklifts in 1984,[4] but apparently did nothing to ensure that similar, comprehensive training would be available to Action and other employees in the future. The training Stephens received was minimal at best. It consisted of a brief introduction--twenty minutes or so--by Kent Albaugh, an Action supervisor, who instructed Stephens on only the basics of operating the forklift and promptly put him to the task of completing his first pick card assignment. When Stephens expressed concern about his abilities to operate the forklift, Albaugh assured him that he would become familiar with the machine by operating it on the job. II Jt.App. at 326. Although Stephens conceivably could have insisted upon access to a copy of the operator's manual, such copies were generally not available to Action supervisors or employees.[5] The duty, in any event, was on BFI to see to it that Action employees received the necessary information about the safe use of the forklifts and had practical experience operating them.
 
 II.
 
 15
 The second issue presented for our consideration is whether the evidence was sufficient to support the jury's award of $500,000 for Stephens' loss of future earning capacity. Stephens suffered a permanent injury to his left foot as a result of the accident. He underwent three operations to reconstruct his heel, in which muscle tissue from his abdomen was attached to his heel. Bryan Dale DenHartog, a board-certified orthopedic surgeon, calculated Stephens' permanent partial impairment rating to be thirty-one percent of his lower extremity, which, in practical terms, means that Stephens is limited in the number of hours he can stand and in the amount he can lift. III Jt.App. at 457-58. DenHartog also indicated that future surgery might be necessary, and that Stephens faces the possibility of increased problems with blood supply to his foot as well as an increased likelihood of foot ulceration. Id. at 460, 465.
 
 
 16
 The district court found, and we agree, that there was substantial evidence from which a jury could find that Stephens suffered a loss of future earning capacity. The court expressed concern, however, over the amount of the damages awarded--$500,000--and, in light of the jury's apparent failure to reduce the award to its present value, indicated that remittitur or, alternatively, a new trial might be necessary. I Jt.App. at 99. The court declined to choose either of these options, and, instead, thought it in the best interest of justice to allow us to review the "generous" amount of damages awarded, id. at 98, so as to prevent putting "the plaintiff in a position of having to accept a remittitur or go through a second trial in order to preserve a right to appeal a court order to remit." Id. (citing Cunningham v. City of Overland, 804 F.2d 1066, 1069 n. 2 (8th Cir.1986)).
 
 
 17
 Iowa recognizes loss of earning capacity as a compensable item of damages. Anthes v. Anthes, 258 Iowa 260, 139 N.W.2d 201, 207 (1965) (citing Grant v. Thomas, 254 Iowa 581, 118 N.W.2d 545, 548 (1962)). The impairment to future earning capacity is measured by the reduction in the value of the power to earn, not the difference in earnings received for a specific occupation before and after the injury. Id. 258 Iowa 260, 139 N.W.2d at 208; Hysell v. Iowa Public Serv. Co., 559 F.2d 468, 473 (8th Cir.1977). Stated otherwise, damages for loss of future earning capacity are "determinable by the difference between the value of an individual's services, if working, as he would have been but for the injury, and the value of the services of an injured person, if working, in the future." Anthes, 258 Iowa 260, 139 N.W.2d at 208 (citing 22 Am.Jur.2d Damages Sec. 92). There is no fixed rule for estimating the amount of damages for loss of future earning capacity. Id. Among the factors a jury may consider in awarding impairment of earning capacity is the plaintiff's past earnings. Hysell, 559 F.2d at 473.
 
 
 18
 At the time of his injury, Stephens was making $5.50 an hour as a forklift operator at Midwest. His income increased to $6.00 per hour after the injury. Stephens testified at trial that he planned to pursue a career in warehousing and had hoped to obtain a job at the Des Moines Firestone plant where union warehousemen received $12.00 per hour plus benefits. Based on this, he argued that he was entitled to a loss of future earning capacity of at least $581,360, which, broken down, is the difference between his earnings after the injury ($6.00 per hour) and what he expected to earn as a warehouseman at Firestone ($12.00 per hour), or $13,520 a year, projected over his remaining work life of forty-three years. Stephens' Br. at 40. The jury apparently accepted this reasoning and awarded damages for $500,000.
 
 
 19
 The district court surmised that the jury, relying on the evidence Stephens presented (to which BFI did not object), calculated damages for lost wages rather than loss of future earning capacity. The court also conjectured that the jury, in awarding $500,000 for loss of future earning capacity, failed to account for the present value of the damages in spite of being instructed on the issue.[6]
 
 
 20
 We are of the opinion that remittitur is necessary, and believe that the district court is in the best position to determine the appropriate amount that should be entered. Taking into account present value, the court indicated that a remittitur of $160,000 would be appropriate. We find this amount to be reasonable. We expect that the court, however, will give both parties an opportunity to present their arguments on this issue, as remittitur was raised sua sponte by the court in its order denying BFI's motions and neither party has had a chance to express its view on it. Accordingly, the case is remanded with directions for the district court, after appropriate briefing, to enter remittitur in the amount of $160,000, or an amount it determines to be in the best interest of justice.
 
 
 
 [1]
 The other damages awarded were past lost earnings, $32,475; past medical expenses, $52,966.94; future medical expenses, $25,000; past pain and suffering, $20,000; future pain and suffering, $10,000; past loss of function of the body, $10,000; and future loss of function of the body, $50,000
 
 
 [2]
 Even if BFI's actions were so limited, what is critical is not necessarily the type of job performed, but the degree of control retained over the work performed by Action personnel. See Restatement (Second) of Torts Sec. 414(a) ("If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability....")
 
 
 [3]
 According to Karl Hinrichs, an Action supervisor at Midwest, Action employees had no discretion as to how they were to perform the work described in the cards. III Jt.App. at 479. Without the pick card "employee[s] wouldn't know what to do." Id
 
 
 [4]
 According to Action supervisor Kent Albaugh who worked at the warehouse when the narrow-aisle forklifts were first introduced, the training included a visual presentation, an examination, and time for employees to familiarize themselves with the unit. III Jt.App. at 530-33
 
 
 [5]
 The manuals apparently were in the possession of the person BFI designated to repair the forklifts. Kent Albaugh, the Action supervisor who trained Stephens, was not even aware that such manuals existed. III Jt.App. at 545
 
 
 [6]
 The jury was instructed on the meaning of "present value" as follows:
 Any award of damages for future pecuniary loss must be reduced to its present cash value.
 Present cash value is the present sum of money which, together with the interest earned thereon when invested so as to yield the highest interest rate of return of a good, sound investment, consistent with reasonable security, will pay the equivalent of future damages at the times, in the amounts, and for the period that you find such future damages will be incurred with reasonable certainty.
 Jury Instruction No. 20.