# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3966
_____

Ricky Spaulding

*Plaintiff - Appellant*

v.

Conopco, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 24, 2013
Filed: January 29, 2014

_____

Before WOLLMAN, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Ricky Spaulding worked as an employee of an independent contractor that provided industrial cleaning services to Conopco, Inc. ("Conopco") at its Unilever plant in Independence, Missouri. While cleaning a large tank, Spaulding fell into it and suffered severe personal injuries. Spaulding sued Conopco, asserting negligence

based on a variety of Conopco's alleged acts and omissions. The district court[1] granted Conopco's motion for summary judgment. The district court concluded that Conopco owed Spaulding no legal duty of care because it did not exercise substantial control over the jobsite or Spaulding's work activities. Spaulding argues on appeal that (1) Conopco exercised substantial control over the jobsite and Spaulding's work activities such that Conopco, as landowner, owed Spaulding a duty to exercise reasonable and ordinary care, and (2) Conopco owed Spaulding a duty to warn independent of Conopco's level of control. We affirm.

## I. *Background*

Spaulding usually worked for Crown Services, Inc. ("Crown"), but occasionally Crown assigned Spaulding to work as a temporary employee for Vac-Con Industrial Services, Inc. ("Vac-Con"). When working for Vac-Con, Spaulding "hydroblasted" industrial machinery. Hydroblasting is an industrial-cleaning technique employing a high-pressure water gun. Hydroblasters are similar to commercial pressure washers except more powerful.

On May 15, 2010, Crown assigned Spaulding to work for Vac-Con to clean areas of Conopco's Unilever plant. Vac-Con personnel instructed Spaulding to clean a particular tank known as the Kettle 910. Although he had cleaned other tanks, Spaulding had never hydroblasted or otherwise cleaned the Kettle 910. A protective steel heat shield prevented Spaulding from accessing certain interior portions of the Kettle 910. To reach these areas, Spaulding climbed atop some railing located above the Kettle 910. While standing on this wet railing, Spaulding slipped and plummeted headfirst into the Kettle 910. Spaulding alleges that the blades located within the Kettle 910 somehow became activated such that the tank pulled him by his collar into the tank. Because of the fall, Spaulding suffered severe personal injuries, including

---

[1]The Honorable Beth Phillips, United States District Judge for the Western District of Missouri.

injuries that would require a partial amputation of his right leg. Spaulding filed for and received workers' compensation benefits through Crown as a result of this accident.

On March 31, 2011, Spaulding brought this diversity action against Conopco. Spaulding asserted that Conopco negligently failed to provide a scaffold, ladder, or lift to allow him to access all portions of the tank. Spaulding contended that Conopco's failure made the Kettle 910 a defective and dangerous condition on Conopco's premises that was not reasonably safe for Spaulding as an invitee. Furthermore, Spaulding contended that Conopco failed to exercise ordinary care to warn him of this dangerous condition and in maintaining it.

Conopco countered by asserting that it owed Spaulding no duty of care under Missouri premises-liability law because Conopco did not exercise substantial control over the jobsite or Spaulding's work activities. The district court agreed with Conopco and granted summary judgment in its favor. Spaulding timely appealed.

## II. *Discussion*

On appeal, Spaulding argues that the district court erroneously granted summary judgment in Conopco's favor because (1) Conopco exercised substantial control over the jobsite and Spaulding's work activities such that Conopco, as landowner, owed Spaulding a duty to exercise reasonable and ordinary care, and (2) Conopco owed Spaulding a duty to warn independent of Conopco's level of control.

In response, Conopco argues that it did not maintain control over the jobsite where Vac-Con employees cleaned or the activities of Vac-Con employees highlighting eight facts. First, Conopco emphasizes that it never provided hydroblasting training or equipment to Spaulding or other Vac-Con employees. Second, Conopco highlights Spaulding's deposition testimony stating that his immediate Vac-Con supervisor "controlled the jobsite." Third, only Vac-Con employees determined how to hydroblast the tanks and machines, such as determining

the amount of water pressure to be used. The Unilever employees merely identified the tanks to be cleaned. Fourth, Spaulding only spoke to Unilever plant personnel about non-work related matters when exchanging greetings or mere pleasantries. No Unilever plant personnel instructed Spaulding as to hydroblasting or how he should otherwise conduct his work. Fifth, on the day of the accident, no Unilever plant employees were in sight or otherwise present. Sixth, neither the Unilever plant Maintenance Planner nor the Unilever plant Building Mechanic instructed Spaulding how to conduct his hydroblasting activities. Seventh, Vac-Con management attended Conopco's annual safety-training sessions. Vac-Con management should have instructed Spaulding as to any relevant safety matters. These training sessions did not include hydroblasting instructions. Finally, only Vac-Con employees attended the daily safety meetings, including the meeting that occurred on the day of Spaulding's accident.

A court properly grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is "genuine" when the evidence would allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts must be viewed in a light most favorable to the nonmoving party when genuine disputes of fact arise at the summary-judgment stage. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A nonmoving party who bears the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's" claim at the summary-judgment stage, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Missouri law applies in this diversity case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

## A. *Control*

The crux of this dispute is whether Conopco exercised sufficient control over the jobsite and Spaulding's work activities to be held liable for injury to its independent contractor's employee.

Under Missouri law, a property owner owes an invitee the duty to use reasonable and ordinary care to prevent injury. *Matteuzzi v. Columbus P'ship, L.P.*, 866 S.W.2d 128, 132 (Mo. 1993) (en banc). "An 'invitee' is 'a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.'" *Harris v. Niehaus*, 857 S.W.2d 222, 225 (Mo. 1993) (en banc) (quoting Restatement (Second) of Torts § 332 (1965)). Employees of an independent contractor who have permission to use the landowner's facilities or premises are invitees. *Matteuzzi*, 866 S.W.2d at 132. It is undisputed that Spaulding, an employee of an independent contractor, was an invitee for purposes of Missouri premises-liability law.

In *Matteuzzi*, the Supreme Court of Missouri established a significant exception to the general rule that property owners owe invitees a duty to exercise reasonable care to prevent invitee injury, stating, "If, however, the landowner relinquishes possession and control of the premises to an independent contractor during a period of construction, the duty of care shifts to the independent contractor. The landowner, no longer considered the possessor of the land, is thus relieved of potential liability." *Id.*

Missouri courts have offered multiple explanations for this exception. First, where the landowner relinquishes possession and control of the premises to an independent contractor, the independent contractor should be charged as the party most capable of avoiding risks of harm that could strike the contractor's employees. *Zueck v. Oppenheimer Gateway Props., Inc.*, 809 S.W.2d 384, 386 (Mo. 1991) (en banc). Second, with the advent of workers' compensation, employees of independent

contractors can recover money for accidents that occur while on the job.[2] *See Gillespie v. St. Joseph Light & Power Co.*, 937 S.W.2d 373, 376 (Mo. Ct. App. 1996). The contractors purchase workers' compensation insurance, and they pass these costs on to the landowners with whom they contract. *Id.*

*Matteuzzi* requires that the employee show that the landowner controlled the jobsite and the activities of the contractor. *Matteuzzi*, 866 S.W.2d at 132. Furthermore, the landowner's involvement in overseeing construction must be substantial, for it must go beyond securing compliance with contracts. *Id.* The landowner must control "the physical activities of the employees of the independent contractors or the details of the manner in which the work is done." *Id.* (quotation and citation omitted). Bare assertions of control will not suffice. *See id.* We have recognized that Missouri courts have applied *Matteuzzi* broadly. *See Mullins v. Tyson Foods, Inc.*, 143 F.3d 1153, 1156 (8th Cir. 1998).

### a. *Safety Policies*

As proof of Conopco's control over the jobsite, Spaulding highlights the "lockout/tagout" procedures as evidence of Conopco's control over the jobsite. Lockout/tagout is the safety protocol that Conopco adopted to ensure that various tanks and machines are properly powered off before and during maintenance. Kyle Blessing, a Vac-Con employee who worked with Spaulding on the day of the accident, testified that he had never seen the lockout/tagout procedures because it was Conopco's responsibility to lockout/tagout the machines. Conopco, as the owner,

---

[2]If the landowner is held liable for an injury that the independent contractor's employee sustains, then the landowner would essentially be paying twice for the employee's injury. In fact, this court has previously articulated the *Matteuzzi* rule as "a landowner is not liable for injuries to the employees of independent contractors for work done on the premises if the employees are covered by the independent contractor's workers' compensation insurance. This is true even in cases where the landowner was directly negligent." *Mouser v. Caterpillar, Inc.*, 336 F.3d 656, 664–65 (8th Cir. 2003) (citing *Matteuzzi*, 866 S.W.2d at 131–32).

possessed the requisite familiarity with the plant's tanks and machines to perform the lockout/tagout. William Akins, the general manager of Vac-Con, when deposed, also testified that Conopco had lockout/tagout responsibility. Spaulding contends that Conopco's control over the lockout/tagout procedures illustrate that Conopco sufficiently controlled the jobsite for purposes of premises liability.

Spaulding also emphasizes that Conopco implemented unique and specific safety rules for visitors to the Unilever plant. Blessing testified that Conopco required all persons entering the plant to follow certain safety, security, environmental, and manufacturing rules. Conopco gave these rules to visitors through handouts and instructional videos. Conopco's Safety, Health, and Environmental Coordinator, Kevin Guthrie, testified at deposition that Conopco required all contractors who entered the Unilever plant to participate annually in its safety-training sessions. Vac-Con management personnel attended these sessions, but Spaulding never participated in them. Conopco and Vac-Con created a program known as the Pre-Job Hazard Assessment (PJHA) whereby Conopco and Vac-Con personnel participated in an initial walkthrough of the plant followed by daily meetings of Vac-Con employees where they would identify potential safety risks that were present during the day's tasks. Spaulding argues that these specific and unique safety practices demonstrate that Conopco retained control over the jobsite and over Vac-Con employees. To summarize Conopco's level of control, Spaulding highlights a portion of Akins's testimony in which he stated,

> The procedure normally is when we arrive at the plant we park where we're told to park, we go through the gate we're told to go through, we go through the door we're told to go through, report to the individuals we're going to report to, they take you to the supervisor, sometimes the whole crew, and show them the work that's to be done that day and the procedure how they want it, what they want cleaned, how they want it cleaned, and then the Pre-Job Hazard Assessment is put into effect from our part [that] covers all the hazards of the day to include lockout/tagout, other things that are either deemed necessary by the plant or our personnel.

A landowner's adoption of general safety policies will not suffice to establish control over the jobsite. *Smart v. Chrysler Corp.*, 991 S.W.2d 737, 746 (Mo. Ct. App. 1999). In *Smart*, an employee of a subcontractor was injured when he fell from a construction platform while working at a vacant Chrysler plant. *Id.* at 739. Chrysler had provided safety guidelines and instructions as well as stationed safety personnel throughout the construction site. *Id.* at 740. The court determined that those efforts were insufficient to demonstrate Chrysler's control of the workplace and affirmed summary judgment on Chrysler's behalf. *Id.* at 747. The court deemed Chrysler's activities as necessary merely to secure compliance with the contract and thus insufficient to impose liability. *Id.* at 746. Similarly, in *Werdehausen v. Union Electric Co.*, an employee of an independent contractor was injured when another employee of the independent contractor accidentally kicked wood off of a scaffold that landed on plaintiff. 801 S.W.2d 358, 361 (Mo. Ct. App. 1990). Plaintiff argued that the landowner should have placed toe boards on the scaffold to prevent materials from sliding off. *Id.* The Missouri Court of Appeals reversed a jury verdict for plaintiff, noting that the landowner's ability to stop work at any time for safety concerns did not amount to sufficient control over the jobsite. *Id.* at 364–65.

Conopco's adoption of general safety policies is not enough to establish that Conopco retained control over the jobsite. *See, e.g.*, *Smart*, 991 S.W.2d at 746; *Werdehausen*, 801 S.W.2d at 364–65. Conopco's requirement that independent contractors attend safety-training sessions conducted annually also does not establish Conopco maintained control. These sessions apparently involved only management of the independent contractors. Furthermore, the annual session did not include safety instructions related to hydroblasting. These safety-training sessions were merely a routine requirement applicable to all independent contractors who planned to enter the Unilever plant that covered a broad array of safety concerns. In both *Smart* and *Werdehausen*, Missouri courts determined that more intrusive methods of safety oversight—stationing of landowner personnel throughout the jobsite and veto power for safety concerns over any actions of the independent contractor—failed to establish

-8-

retention of control as a matter of law. Thus, the less-intrusive method of requiring annual attendance at a safety seminar also fails to establish the requisite control.

Additionally, the creation of the PJHA does not constitute the requisite retention of control. Spaulding has failed to demonstrate that Conopco representatives participated in the PJHA program other than as part of an initial walkthrough of the plant. The PJHA functions merely as a means for Vac-Con employees to meet to discuss general safety concerns and equipment details. It did not serve as an oversight mechanism for Conopco to direct the activities of Vac-Con's employees. Thus, Conopco's safety policies do not show that it retained substantial control over the jobsite or Vac-Con's employees.

### b. *Job Task*

Spaulding also finds it significant that Conopco selected the tanks to be hydroblasted. As proof of substantial control, Spaulding cites Blessing's deposition testimony. Blessing testified that, typically, a Conopco representative identified the specific tanks to be cleaned.

A landowner's selection of the independent contractor's immediate job task will not suffice to shift liability to landowner. *Lawrence v. Bainbridge Apartments*, 919 S.W.2d 566, 570 (Mo. Ct. App. 1996). In *Lawrence*, the Missouri Court of Appeals affirmed a trial court's grant of summary judgment to a landowner when the employee of an independent contractor injured himself while washing windows. 919 S.W.2d at 568. To support his contention that the landowner retained sufficient possession and control over the premises, the employee noted that an agent of the landowner checked employee into the jobsite each morning, unlocked the door to the rooftop and scaffold equipment, and removed screens from windows so they could be washed. *Id.* at 569–70. The court concluded that merely providing access to necessary areas does not constitute control over the physical activities or the details of the manner in which contract work was performed. *Id.* at 570.

Furthermore, a landowner's insistence that the independent contractor perform the contract in a certain manner does not necessitate a finding that the landowner retained possession and control over the premises. In *Lawrence*, the Missouri Court of Appeals rejected an employee's contention that the landowner maintained possession and control over the jobsite when the landowner required the employees of the independent contractor to wash windows from the outside rather than the inside. *Id.* at 569–70. The court determined that the defendant did not control the details of the manner in which the independent contractor performed window washing; rather, the defendant contracted for a completely different job—window washing from the outside rather than the inside. *Id.* at 570. Relatedly, in *Owens v. Shop 'N Save Warehouse Foods, Inc.*, the Supreme Court of Missouri affirmed the trial court's grant of summary judgment to a landowner who owned a store where the employee of an independent contractor was injured. 866 S.W.2d 132, 133–35 (Mo. 1993) (en banc). The employee, who was to paint the store ceiling, slipped off of a scaffold due to wet paint. *Id.* at 133. The landowner insisted on a paint color that was unavailable in fast-drying "safety spray" form, so the employee had to use a slicker, oil-based paint. *Id.* The court determined that selection of a paint color even after being informed of its potential safety hazard did not constitute sufficient control to impose liability. *Id.* at 134–35.

In the present case, Spaulding fails to demonstrate how Conopco controlled the manner and means for Vac-Con to clean these tanks, including the Kettle 910. As shown in *Lawrence*, selecting items to be cleaned and providing access to the plant do not constitute sufficient control to impose liability on Conopco from an injured invitee. Conopco selected the Kettle 910 for cleaning per its contract with Vac-Con. In fact, the lockout/tagout protocols were also a mere means of allowing Vac-Con employees to access the tanks, much like the grants of access in *Lawrence*.

Nevertheless, Spaulding emphasizes *Brister v. Ikenberry*, 300 S.W.3d 588, 592 (Mo. Ct. App. 2009), and *Stephens v. Crown Equipment Corp.*, 22 F.3d 832, 836 (8th

Cir. 1994), in support of his contention that Conopco maintained possession and control over the premises. In *Brister,* the Missouri Court of Appeals reversed a trial court's grant of summary judgment to a landowner who the trial court found was not in control of the jobsite where the employee of an alleged independent contractor[3] was electrocuted while working. In holding that genuine issues remained as to who controlled the premises, the court acknowledged that the landowner instructed the independent contractor on the work it was to perform and when to perform it. *Id.* at 593. Spaulding also points to *Stephens* where this court affirmed a jury verdict that found a landowner liable for injuries sustained by an employee of an independent contractor. 22 F.3d at 836. The employee was injured when he wedged his ankle between a wall and the forklift that he was operating. *Id.* at 834. In affirming the jury's verdict finding the landowner liable, we emphasized the importance of the landowner's "pick cards" that directed the work an independent contractor's employees were to complete each day as indicative of the landowner's retention of control. *Id.* at 834–35.

Both *Brister* and *Stephens*, however, are distinguishable. First, the *Brister* court observed that the landowner determined the tasks that the independent contractor was to perform. However, several additional facts demonstrated the landowner retained control. These facts included: daily meetings between representatives of both companies, landowner instructions that certain employees of the independent contractor be pulled from certain jobs to work on other jobs, a "clean-up" list of work for the independent contractor to perform, landowner training of the independent contractor's employees, landowner supply of materials and tools, two-way radio contact between the two companies on several subjects dealing with the manner in which the independent contractor's employees performed their work, and direct

---

[3]The *Brister* court could not determine as a matter of law whether the company there was actually an independent contractor; however, the court nonetheless treated the employee as an invitee such that its conclusions on landowner control apply here. *Brister*, 300 S.W.3d at 594.

supervision of landowner over the project. *Brister*, 300 S.W.3d at 593. Thus, the degree of landowner control in *Brister* was significantly greater than the control Conopco retained.

Second, the pick cards in *Stephens* relayed much more information than the employee's work assignment. The independent contractor's employees "relied exclusively on the information in the cards to perform their work." *Stephens*, 22 F.3d at 835. Furthermore, "[t]he pick cards provided all of the information needed for [the independent contractor's] employees to complete their daily assignments, and, indeed, were vital to their ability to function at all." *Id.* The landowner in question also owned the equipment that the independent contractor's employees used and had exclusive control over this equipment. *Id.* The landowner also retained discretion over the number of employees that the independent contractor could use on the landowner's projects. *Id.* at 836. *Stephens* also involved Iowa's arguably less stringent standard for imposing liability on a landowner. In Iowa, landowners may be liable for injuries to an employee of an independent contractor when the landowner "retains *some* degree of control over *any* part of the work." *Id.* at 835 (emphases added). Thus, *Stephens*, too, is distinguishable.

### c. *Blessing's Testimony*

As proof of substantial control, Spaulding notes that Blessing also testified that Conopco representatives typically identified tanks to be cleaned and how they wanted the tanks cleaned. Spaulding also relies on Blessing's testimony that Conopco prepared the Kettle 910 to be cleaned by draining the tank and powering it off. Blessing also stated that Conopco alone controlled the Kettle 910's surrounding platform configurations, which prohibited access to the tank. Blessing's view of Conopco's control over the platform configurations led Blessing to conclude that Conopco controlled the jobsite. Based on his observations, Blessing opined that Conopco exercised control over the activities of the contractors.

The district court determined that this testimony consisted of "bare legal conclusions" that it refused to consider on a motion for summary judgment. Spaulding now contends that Blessing's assessment as to who "controlled" the jobsite and Vac-Con's employees was not legal but factual in nature, for "control" is both a legal term of art and a word used in everyday language outside of a legal context. We agree with the district court, however, that Blessing's answer was not really a factual observation at all. In response to the leading question, "The plant owner exercises control over the activities of the contractors, right." Blessing replied, "Correct." "We consider only admissible evidence and disregard portions of various affidavits and depositions that . . . purport[] to state legal conclusions as fact." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). Furthermore, Blessing's testimony was inconsistent. He also testified that Conopco representatives never told him how to conduct his work, including hydroblasting. Thus, the district court properly disregarded Blessing's conclusions, for Missouri law requires more landowner control than what Spaulding has demonstrated.

### d. *Summary*

In sum, the district court properly granted Conopco's motion for summary judgment. Conopco owed Spaulding no duty to act with ordinary and reasonable care where Conopco did not retain sufficient control over the jobsite or over Vac-Con's employees. Additionally, Conopco did not voluntarily assume a duty to exercise reasonable care to prevent injury to Spaulding. *See Smart*, 991 S.W.2d at 746 (rejecting plaintiff's assumption-of-duty argument where defendant lacked sufficient control over the premises).

### B. *Failure To Warn Absent Retention of Control*

Spaulding argues alternatively that Conopco had a duty to warn him of dangerous conditions like the Kettle 910 regardless of Conopco's retention of control. Spaulding cites three cases where Missouri courts imposed this duty without discussion of the landowner's retention of control. *See Redman v. Earle M. Jorgenson*

*Co.*, 491 S.W.2d 304, 307 (Mo. 1973) (en banc); *Guthrie v. Reliance Constr. Co., Inc.*, 612 S.W.2d 366, 369 (Mo. Ct. App. 1980); *Schneider v. Sw. Bell Tel. Co.*, 354 S.W.2d 315, 318 (Mo. Ct. App. 1962).

Conopco correctly points out that Missouri courts do not follow a rule that landowners owe employees of independent contractors a duty to warn of dangerous conditions. Conopco relies on *Gillespie* where the Missouri Court of Appeals recognized that "[b]eginning in 1977 . . . Missouri's rules governing landowner liability to employees of independent contractors began a series of changes." 937 S.W.2d at 376. Furthermore, the *Gillespie* court noted that Missouri courts no longer consider the nature of the landowner's activity but the landowner's degree of control over the premises. *Id.* at 377. Finally, the *Gillespie* court determined that courts should focus on landowner control rather than the landowner's activities when the employee brings a failure-to-warn claim as well. *Id.* at 378 The *Gillespie* court stated:

> We cannot distinguish [landowner's] alleged negligent failure to warn about or correct the dangerous condition of the beams in this case from the landowner's direct negligence in not correcting an unsafe brick wall [that] fell on the employee in *Matteuzzi* . . . . Yet, in *Matteuzzi*, . . . the landowner was not held liable because it did not control the details of the work. This is the rule we must apply in this case, also.

*Id.* Missouri courts, therefore, inquire into the degree of the landowner's control to determine whether the landowner owed an employee of an independent contractor a duty to warn. Because Spaulding has not shown that Conopco retained control over the jobsite or the manner of Spaulding's performance, Conopco had no duty to warn Spaulding of potential dangers surrounding the Kettle 910.

### III. *Conclusion*

Accordingly, we affirm the district court's judgment.

_____